

IN THE
TENTH COURT OF APPEALS

No. 10-12-00164-CR

CHRISTOPHER ALLEN PHILLIPS,

Appellant

v.

THE STATE OF TEXAS,

Appellee

From the 19th District Court
McLennan County, Texas
Trial Court No. 2011-939-C1

OPINION

A jury convicted Appellant Christopher Allen Phillips of aggravated robbery and assessed his punishment, enhanced by a prior felony conviction, at life imprisonment. This appeal ensued.

**Background**

Phillips does not challenge the sufficiency of the evidence, but the record shows that on January 17, 2011, Marcia Judd was just finishing styling her client Loraine Price's hair at the Mane Attraction beauty salon in Hewitt when a six-foot-tall man

wearing solid black, including a black mask, black gloves, and black shoes, came through the front door of the salon with a gun drawn. The man demanded money, but neither Judd nor Price had any money on them. Judd admitted, however, that her purse was "in the back." The man began to lead Judd to the back of the salon. The man then looked back toward Price and told her to get up. Judd then remembered that she had Mace in her pocket and attempted to spray the man with it. As Judd and the man began fighting over the Mace, Price ran outside. Judd said that inside the salon, the man caused her to fall down on her back and that her head hit the concrete. She heard a gunshot, and the man then grabbed her purse and ran out the door. A green backpack that he had brought with him was left lying on the floor. The backpack was later found to have a crack pipe in it. Price said that as she was running away from the salon, she also saw the man point the gun at her and take a shot at her.

Jerry Sims testified that he was at Judd's Veterinary Clinic next door to the Mane Attraction when Price came in terrified and said that someone was going to shoot them. Sims stepped out of the clinic and saw a man run and jump into the passenger side of a car. Sims said that he did not actually see a driver but that he assumed there was a driver because the man got into the passenger side, and the passenger door may not have even been closed before the car "burned rubber."

About thirty minutes later, a credit card from Judd's stolen purse was used at A&A Food Mart in McGregor, and it was caught on surveillance video. The car at the gas station matched the description that was provided by Sims. Surveillance showed Phillips getting into the passenger seat and Andre Dulin getting into the driver's seat of

the car.  Hewitt Police Detective Brad Bond testified, "They would have had to go straight there without making any stops in order to get there in time."  Dulin used Judd's credit card, and Phillips was next to him when he used it.  Dulin is only five foot, seven inches tall, and Detective Bond said that Phillips matched the description given of the actual robber.

Dulin testified that he was indicted for the same robbery for which Phillips was on trial, as well as indicted for two drug cases (possession of cocaine) and for a credit card abuse case.  There had been no deals made about any of his cases.  Dulin stated that he was driving with Phillips as his passenger when Phillips saw the beauty salon and told him to pull in.  Dulin pulled in and parked his car backwards.  When asked if he knew that Phillips wanted to rob the place, Dulin replied, "No, not really."  Dulin said that he first knew Phillips wanted to rob the place when he saw Phillips put on gloves and a hoodie as he was backing up the car.  When Phillips got out, Dulin waited even when he heard women screaming.  Dulin said Phillips was in the salon about four or five minutes at the longest.  Phillips came out of the salon and had a purse in his hand.  They then drove off and went to the gas station in McGregor, where he used the credit card.

Several days after the robbery, Dulin was stopped and arrested because he had warrants.  McGregor Police Officer Kelly Dunlap inventoried his vehicle and found a purse between the passenger seat and the center console, "shoved down almost against the floorboard."  The contents of the purse belonged to Judd and the Mane Attraction.  Dulin testified that he called his cousin and told him to call Phillips after he was

arrested. They "[u]sed a three-way." Dulin was mad at Phillips and told him that he

had been arrested because Phillips left the black bag from the purse in his car.

**Jury Charge**

In his first issue, Phillips contends that the trial court erred by not including an

instruction in the guilt/innocence charge about "how to consider the 'jailhouse

testimony' of Kavin Diggs and Elroy Slaughter in accordance with" article 38.075 of the

Code of Criminal Procedure. We will first determine whether the charge was

erroneous. *See Tolbert v. State*, 306 S.W.3d 776, 779 (Tex. Crim. App. 2010); *Watkins v.*

*State*, 333 S.W.3d 771, 776 (Tex. App.—Waco 2010, pet. ref'd). But because Phillips did

not object to the charge on this basis, error will not result in reversal of his conviction in

the absence of "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App.

1985) (op. on reh'g)).

> Article 38.075, which became effective on September 1, 2009, provides:
>
> (a) A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed. In this subsection, "correctional facility" has the meaning assigned by Section 1.07, Penal Code.
>
> (b) Corroboration is not sufficient for the purposes of this article if the corroboration only shows that the offense was committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075 (West Supp. 2013). Article 38.075 was enacted in

recognition that incarcerated individuals have an incentive to provide information

against other incarcerated individuals and that it is therefore "imprudent" to convict a

person based on an incarcerated informant's statement providing information related to a crime that only declares the crime was committed without additional evidence to substantiate the informant's claim. SENATE COMM. ON CRIMINAL JUSTICE, BILL ANALYSIS, Tex. S.B. 1681, 81st Leg., R.S. (2009); *see Watkins*, 333 S.W.3d at 778. Both Phillips and the State agree that if article 38.075 applies, the trial court was under a duty to instruct the jury *sua sponte* according to article 38.075. *See Brooks v. State*, 357 S.W.3d 777, 781 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) ("Analyzing article 38.075 under case law applicable to similar corroboration requirements, we conclude that the trial court was under a duty to instruct the jury *sua sponte* according to article 38.075.").

Kavin Diggs testified that he was in jail with Phillips at the time of trial. They had been in a cell together, and Phillips tried to get him to say that he heard Andre Dulin, Phillips's alleged accomplice, say that Dulin committed the offense by himself. Diggs told Phillips that he would not say anything like that because he had never heard Dulin say anything like that. Diggs stated that he had only heard Dulin and Phillips each say that the other one had committed the offense. When asked on cross-examination whether Phillips ever asked him to say that Dulin "did this or anything like that," Diggs replied, "No, he ain't never told me to say that [Dulin] did it." Diggs stated that Phillips "wanted me to speak on something that I don't know nothing about," so Diggs told Phillips, "I'm not going to do that because I don't know anything about it."

Elroy Slaughter testified that he was in jail with Phillips about three months before the trial and that Phillips tried to talk to him about signing a statement or written

affidavit stating that Dulin was "going to try and put the case off on him." Slaughter stated that he did not sign a statement for Phillips because "I feel like I ain't got nothing to do with it." Slaughter said that he had never talked to Dulin. When asked if he felt like Phillips was trying to get him to lie for him, Slaughter replied that he did feel like that. Slaughter continued, "I feel like he was trying to get me to sign an affidavit so he could clear himself from the case." On cross-examination, however, Slaughter testified as follows:

> Q. Isn't it true that you told [an investigator] that -- specifically that Andre Dulin told you that he was mad at Chris Phillips because he thought [Phillips] was sleeping with his wife and he was going to try to pin this case on him?
>
> A. That's pretty much -- that's what he had put me up to do, though. It's like I was led in blind on that, though I ain't had nothing to do with it.
>
> Q. Isn't that what you told him specifically?
>
> A. Yeah, that's what I told him.
>
> Q. Okay. And now your story has changed, that [Phillips] just told you that?
>
> A. Yeah.
>
> ….
>
> Q. ….
> [Phillips] was telling you his version of what happened in this case; that he showed you his paperwork from me and what the prosecutors were alleging against him, and he was telling you his version of what happened.
>
> A. Yeah.
>
> Q. He thought [Dulin] was setting him up.

A.    Yes.

....

Q.    Isn't it possible that [Phillips] was just hoping you had heard something potentially from [Dulin] about [Dulin] saying something like that?

A.    Could be.

Q.    Okay.  So [Phillips] never specifically said, "I want you to lie about this."

A.    He asked -- he pretty much, you know what I'm saying, asked me to sign an affidavit.  Just like I told him and said first, pretty much asked me to sign an affidavit saying that [Dulin] was going to try to put the case off on him, you know what I'm saying.  If it's saying lying or what you feel like that is, I don't know.

Q.    And you told him that you couldn't because you didn't know anything about it?

A.    Exactly.

Phillips claims that "[t]he import of Diggs' testimony was that [Phillips] was trying to get Diggs to commit perjury in order to contradict the testimony of Andre Dulin who had implicated [Phillips] in the aggravated robbery" and that "[t]he import of Slaughter's testimony was that [Phillips] was trying to get him to sign a false statement or affidavit to contradict Andre Dulin having implicated [Phillips] in the aggravated robbery."   Citing Rule of Evidence 803(24), Phillips asserts that his statements to Diggs and Slaughter were therefore against his interest.[1]   The State

---

[1] Rule of Evidence 803(24) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

argues, however, that article 38.075 did not apply in this case because the statements Phillips allegedly made to Diggs and Slaughter were not confessions or admissions. We agree with the State that article 38.075 does not apply in this case.

According to Black's Law Dictionary, "corroborate" means: "To strengthen or confirm; to make more certain." BLACK'S LAW DICTIONARY (9th ed. 2009). It follows then that "the testimony of a person to whom the defendant made a statement against the defendant's interest" must, at a minimum, tend to connect the defendant with the offense committed before that person's testimony can be "corroborated" by "other evidence" tending to connect the defendant with the offense committed. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075(a). In this case, neither Diggs's nor Slaughter's testimony tended to connect Phillips with the aggravated robbery. *See Fernandez v. State*, 396 S.W.2d 885, 886 (Tex. Crim. App. 1965) ("We do not agree with the State that appellant's attempt to get two witnesses to testify that they had seen him at a certain location on the day in question constitutes a declaration sufficient to corroborate the testimony of the accomplice witnesses and which tends to connect the appellant with the offense committed."). The trial court therefore did not err by not including an article 38.075 instruction in the guilt/innocence charge. We overrule Phillips's first issue.

In his second issue, Phillips contends that the trial court's guilt/innocence charge

....
**(24) Statement Against Interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

was fundamentally defective because the jury was not instructed that Diggs's and Slaughter's "jailhouse testimony" could not corroborate each other's testimony. In his third issue, Phillips contends that the trial court's guilt/innocence charge was fundamentally defective because it did not instruct the jury that Diggs's and Slaughter's "jailhouse testimony" could not corroborate each other's testimony and could not corroborate Dulin's accomplice testimony. Like Phillips's first issue, both of these issues also depend upon article 38.075 applying in this case. Because we held in the first issue that article 38.075 does not apply in this case, we overrule Phillips's second and third issues.

### Authentication

In his fourth issue, Phillips contends that the trial court "abused its discretion in permitting to be published and played for the jury an audio recording purported to be a telephone conversation between [him] and Andre Dulin." More specifically, Phillips argues that the audio recording, State's Exhibit No. 24, was not properly authenticated. We review the admission of evidence for abuse of discretion. *Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996).

Sergeant Johnny Spillman with the McLennan County Jail testified that all phone calls made from the jail are recorded. For him to be able to find a particular phone call, he has to be given a particular telephone number. In this case, he was asked to look up phone calls made to a particular telephone number. He found phone calls made to that telephone number, recorded those calls, and turned them over to the Hewitt Police Department. The following exchange then occurred:

Q.     (BY [Prosecutor]) I'm handing you what's been marked State's Exhibit 24.  Do you recognize that?

A.     Yes.

Q.     Is that a recording -- is that the disk containing the recordings that we were just talking about just a second ago?

A.     Yes.

Q.     Okay.  And is it a true and accurate recording of what was made, the statements made on the phone call?

A.     Yes, it is.

Q.     And was all the recording equipment functioning properly that day?

A.     Yes.

[Prosecutor]:  State offers State's 24?

[Defense Counsel]:  Your Honor, I don't think the proper predicate has been made as far as who the phone call was to or who it was from and I don't know if that's been identified.

[Prosecutor]:  Judge, if that's what he needs, we can have -- the people will be testifying later and we can have them identify it as we go.

[Defense Counsel]:  Before -- I just object until it's been proven here who the phone calls were between and to and I don't know that it would be relevant.

[Prosecutor]:  We'll just wait and offer it until those people testify.  I'll pass the witness.

Thereafter, Dulin testified as follows:

Q.     (BY [Prosecutor])  Did you call the defendant?

A.     Yes, sir.

Q. That day?

A. No, when I got locked up.

Q. On the -- when you got arrested by McGregor PD?

A. Yes, sir.

Q. Have you listened to that phone call --

A. Yes, sir.

Q. -- since then or recently?

A. Uh-huh.

Q. Could you identify all the voices on it?

A. Yes, sir.

Q. Who are the voices on there?

A. Me and Chris.

Q. Okay. And is there anybody else at the beginning?

A. My cousin.

Q. Why did you call your -- how does it work? You called your cousin?

A. Used a three-way.

Q. Can you explain to the jury what -- you called your cousin. Then what did you do?

A. I called my cousin and told him to call Chris, and I called Chris and started talking about everything else, about the stuff that was left in my car.

Q. Okay. I'm showing you what's been marked here as State's 24. Is this the -- appear to be the same phone call you listened to about a week or two ago?

A. Yes, sir.

Q. And you said you can identify all the voices on it?

A. (Moving head up and down.)

[Prosecutor]: At this time I'd offer State's 24.

[Defense Counsel]: Your Honor, I still object. I don't believe it can properly be authenticated that his cousin called Mr. Phillips or who he called from the phone.

THE COURT: Overruled.

[Prosecutor]: Permission to publish, Your Honor.

THE COURT: Yes, sir.

The general provision under Rule 901 states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). In subsection (b) of Rule 901, by way of illustration only, and not by way of limitation, the rule sets forth various examples of authentication or identification conforming with the requirements of the rule. TEX. R. EVID. 901(b). Illustration number (6), entitled "Telephone conversations" states: "Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if: (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called." TEX. R. EVID. 901(b)(6).

Phillips argues that the audio recording of the telephone conversation was not

properly authenticated because neither his telephone number nor the cousin's telephone number was identified, but Rule 901(b) makes it clear that the illustrations given therein are just that and are not by way of limitation.  TEX. R. EVID. 901(b).  It is therefore not always essential that a person know the phone number dialed to establish an identification.  *See* TEX. R. EVID. 901(b); *Herzing v. Metropolitan Life Ins. Co.*, 907 S.W.2d 574, 580 (Tex. App.—Corpus Christi 1995, writ denied).

Furthermore, illustration number (5), entitled "Voice identification" states: "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at anytime under circumstances connecting it with the alleged speaker."  Dulin stated that he had previously listened to the recording of the phone call and that he could identify all of the voices on the recording.  Dulin identified the voices as those of himself, his cousin (a family member whom he had called from jail and had asked to call Phillips), and Phillips (whom he testified to having previous conversations with).  In light of the foregoing, we conclude that the trial court did not abuse its discretion in admitting State's Exhibit No. 24 over Phillips's authentication objection.  We overrule Phillips's fourth issue.

### Competency of Witness

In his fifth issue, Phillips contends that the trial court committed fundamental error by permitting the alleged victim, Marcia Judd, to testify even though she admitted that she was mentally shaken during the robbery because she had hit her head on concrete.

Judd testified that when struggling with the robber, he knocked her down on the floor and she hit her head on the concrete.  On cross-examination, Judd then testified:

> Q.  …
>  Did you make a statement to the police?
>
> A.  As pertaining to what?
>
> Q.  As pertaining to the events of that -- of January 17, 2011.
>
> A.  Yes, sir.  They made me do it immediately.  And I was mentally shook-up and my eyes -- I couldn't see and so I could not even write the report.  I had to have another lady write it for me because I couldn't even see.[2]
>
> Q.  So somebody else wrote the report for you; correct?
>
> A.  Correct.
>
> Q.  And you described the events almost immediately after they happened?
>
> A.  Yes.
>
> Q.  Okay.  And did you feel like you accurately described everything?
>
> A.  Under the state that I was in, yes.

Phillips acknowledges in his supplemental brief that neither party nor the Court raised the issue in the trial court of whether Judd was competent to testify.  Phillips nevertheless argues that we should address the issue because it is a fundamental error that can be considered on appeal despite the lack of objection.  *See* TEX. R. EVID. 103(d).  We disagree.  Because Phillips did not object in the trial court to Judd's testimony on the

---

[2] Judd had earlier testified that in her second attempt to spray Mace at the robber, he had taken her hand and hit it, getting the Mace all in her face.

basis of incompetency, he has failed to preserve this issue on appeal. *See* TEX. R. APP. P. 33.1(a); *Franco v. State*, 492 S.W.2d 534, 535 (Tex. Crim. App. 1973) (in absence of objection, trial court was not required to make preliminary determination of competency); *Grayson v. State*, 786 S.W.2d 504, 505 (Tex. App.—Dallas 1990, no pet.); *see also In re F.E.C.*, No. 04-05-00830-CV, 2006 WL 2612557, at *1 (Tex. App.—San Antonio Sept. 13, 2006, no pet.) (mem. op.); *Gonzales v. State*, No. 03-99-00209-CR, 2000 WL 564166, at *3 (Tex. App.—Austin May 11, 2000, pet. ref'd) (not designated for publication). We overrule Phillips's fifth issue.

Having overruled all of Phillips's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
      (Chief Justice Gray concurring)
Affirmed
Opinion delivered and filed May 15, 2014
Publish
[CRPM]