

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0789-14

### CHRISTOPHER ALLEN PHILLIPS, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### McLENNAN COUNTY

**RICHARDSON, J., delivered the opinion of the unanimous Court. KELLER, P.J. filed a concurring opinion. NEWELL, J. filed a concurring opinion.**

## O P I N I O N

Appellant, Christopher Allen Phillips, was convicted of aggravated robbery. On

appeal, Phillips argued that the trial court erred by failing to include an instruction in the jury

charge pursuant to the jailhouse-witness corroboration statute.[1] The Tenth Court of Appeals

---

[1] TEX. CODE CRIM. PROC. art. 38.075(a) ("A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.").

held that the trial court did not err, concluding that Article 38.075(a) did not apply because the jailhouse witnesses did not testify to any statements made by Phillips that were "statements against [Phillips'] interest." We granted Phillips' petition for discretionary review to examine this holding.[2] Because the trial court should have included an article 38.075(a) instruction in the jury charge, we vacate the appellate court's judgment and remand this case to the court of appeals to conduct a harm analysis and to address the remaining issues raised on appeal.

**BACKGROUND**

**A.    The Mane Attraction**

Loraine Price was having her hair colored and styled by Marcia Judd at The Mane Attraction Beauty Salon on January 17, 2011. Just as Judd was putting on the finishing touches,[3] Phillips came through the door, gun drawn, demanding money. Phillips was dressed in all black, and wore a black mask and black gloves. Neither Judd nor Price had any money on them at the time, but Judd told Phillips that her purse was "in the back," so he led Judd to the back of the salon. Just as Phillips was looking back at Price and telling her to "get up," Judd remembered having Mace in her pocket. She attempted to spray Phillips, and

---

[2]Appellant's ground for review asked us to determine "whether the Court of Appeals erred in holding that the provisions of Article 38.075 Texas Code of Criminal Procedure do not apply in this case, thereby overruling Appellant's first three issues on appeal."

[3] The prosecutor asked Price how far along Judd had gotten in the process of dying Price's hair when Phillips entered the salon – "had she got it dyed?" To that question, Price answered, "Yes, thank God."

they fought over the Mace. Price ran outside. Judd fell and hit her head on the floor. Price said she heard a gunshot. Phillips grabbed Judd's purse and ran out the door. As he was running, Phillips took a shot at Price as she ran from the salon. Phillips left behind his green backpack with a crack pipe in it.

Jerry Sims testified that he was at a veterinary clinic next door to The Mane Attraction when Price came in terrified and said that someone was going to shoot them. Sims stepped out of the clinic and saw Phillips jump into the passenger side of a car. The car then sped away "burn[ing] rubber."

About thirty minutes later, a credit card from Judd's stolen purse was used at A & A Food Mart in McGregor. Hewitt Police Detective Brad Bond testified about a surveillance video that captured Andre Dulin using Judd's credit card and Phillips standing next to him when he used it. Dulin is only five feet, seven inches tall, and Detective Bond said that Phillips matched the description given of the actual robber, who was described as being six feet tall. The video also showed Phillips getting into the passenger seat of a car matching Sims' description of the car that had left The Mane Attraction and Dulin getting into the driver's seat.

Several days after the robbery, Dulin was stopped and arrested because he had outstanding warrants. McGregor Police Officer Kelly Dunlap inventoried Dulin's vehicle and found a purse between the passenger seat and the center console. The contents of the purse belonged to Judd and The Mane Attraction. Dulin was arrested for aggravated robbery,

and he later implicated Phillips, who was then also arrested.

Dulin testified at Phillips' trial. Dulin stated that he was driving with Phillips as his passenger when Phillips saw The Mane Attraction and told him to pull in. Dulin pulled in and backed his car into a parking space. When asked if he knew that Phillips wanted to rob the place, Dulin replied, "No, not really." Dulin said that he first knew Phillips wanted to rob The Mane Attraction when he saw Phillips put on gloves and a hoodie as he was backing up the car. Dulin said Phillips was in The Mane Attraction about four or five minutes, then came out of the salon with a purse in his hand. They drove off and went to the gas station in McGregor, where he used the credit card. After Dulin was arrested he called his cousin and told him to call Phillips. The cousin told Phillips that Dulin was mad at him because Dulin had been arrested because Phillips left Judd's purse in his car.

**B.     The Jailhouse-Witness Testimony of Kavin Diggs and Elroy Slaughter**

After the State rested its case in chief, and after the defense presented its witnesses, the State called two rebuttal witnesses who had been inmates with Phillips in the McLennan County Jail.

Kavin Diggs testified at trial about a conversation he had with Phillips while both were in jail:

Q.     . . . Did [Phillips] ever tell you anything about – relating to this case? Did he ever try to get you to say anything?

A.     Yeah, he tried to get me to say that if I – if I heard his co-defendant say that he did it or whatever. I told him I wasn't going to play with nobody life like that.

* * *

Q.    Are you saying that this defendant tried to get you to say that you heard Andre [Dulin] say he did it by himself?

A.    Yeah.

Elroy Slaughter testified on direct examination that he was in jail with Phillips about three months before the trial:

Q.    Did he [Phillips] ever try to talk to you about a robbery case?

A.    Yes, sir.

Q.    And what did he try to talk to you about?

A.    About pretty much signing a statement or a written affidavit or something saying that, you know what I'm saying, Andre Dulin was going to try to put the case off on him or something.

* * *

Q.    What exactly was he trying to get you to say in an affidavit or a statement?

A.    That – you know what I'm saying, that Andre was going to try and put the case off on him, pretty much.

Q.    Okay.  And you – did you feel like he was trying to get you to lie for him?

A.    Yeah, from – now that, you know what I'm saying, everything that came out, I feel like he was trying to get me to sign an affidavit so he could clear himself from the case.

Q.    Okay.  So this defendant approached you to sign an affidavit about this case?

A.    Yes, sir.

While still under direct examination, Elroy Slaughter testified that he had never

spoken with Andre Dulin. Slaughter testified that he knew who Dulin was but did not know him personally and never talked to him about this case.

During cross examination, however, Slaughter admitted that while in his holding cell he told the case investigator that he had spoken with Dulin. Nevertheless, although defense counsel attempted to impeach Slaughter by pointing out inconsistencies in what he had stated earlier and his testimony at trial, Slaughter stuck to his story:

Q.   Okay. So Chris never specifically said, "I want you to lie about this."

A.   He asked – he pretty much, you know what I'm saying, asked me to sign an affidavit. Just like I told him and said first, pretty much asked me to sign an affidavit saying that Andre was going to try to put the case off on him, you know what I'm saying. If it's saying lying or what you feel like that is, I don't know.

On redirect, Slaughter again explained his interpretation of what Phillips was trying to achieve by asking Slaughter to sign an affidavit:

Q.   Elroy, [defense counsel] asked you if Chris ever told you he did this robbery and you said, "Not being blunt." But what do you mean by that?

A.   Like, pretty much, you know what I'm saying, from what he [Phillips] was trying to get me to do, you know what I'm saying, as far as like signing an affidavit saying that Dulin did it, did the robbery, you know what I'm saying, that could be anything. I feel like he's trying to use me as an escape goat [*sic*]. I ain't got nothing to do with it, you know what I'm saying, to have backup in his defense. It could be to get himself clear and get himself off.

Q.   So from everything that was going on, did you feel like Chris Phillips was trying to get you to lie for him?

A.   Yeah. Yes, sir.

The two sides then rested and closed.  Thereafter, the trial judge excused the jury and asked the two sides if there were any objections to the jury charge.  Both the defense and the State said that they had no objections to the jury charge.  The jury charge that was read by the court contained the standard instructions as well as an accomplice-witness charge pursuant to Article 38.14 of the Texas Code of Criminal Procedure,[4] instructing the jury that Dulin was an accomplice and that they could not convict Phillips on the testimony of Dulin alone without other evidence tending to connect Phillips with the offense charged.  There were no other additional instructions given in the jury charge, and no additional instructions were requested by the parties.

During closing argument, the prosecution recalled the jailhouse-witness testimony for the jury, asking the rhetorical question, "Does an innocent person go around the jail asking people he's just met to sign affidavits and lie for him?"  Without any objections from defense, the prosecution continued to emphasize that "an innocent person doesn't have to do that because they didn't do anything wrong. When you've done something wrong, when you know you're caught is when you have to start asking people to come to court and lie for you. Think about that.  That makes perfect sense."

---

[4] TEX. CODE CRIM. PROC. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . .").

## C.    The Court of Appeals' Decision

On direct appeal, the State argued that, because Diggs and Slaughter did not testify to any admissions or confessions made by Phillips, their testimony did not include statements that were against Phillips' interest, and thus no corroboration and no instruction under Article 38.075(a) was required.  The appellate court agreed with the State that Article 38.075 did not apply to this case, and held that, because the testimony of Diggs and Slaughter did not "connect" Phillips with the aggravated robbery, their testimony could not be characterized as statements Phillips made that were "against [his] interest."[5]  The court of appeals held that "'the testimony of a person to whom the defendant made a statement against the defendant's interest' must, at a minimum, tend to connect the defendant with the offense committed before that person's testimony can be 'corroborated' by 'other evidence' tending to connect the defendant with the offense committed."[6]  The appellate court concluded that the trial court did not err by failing to include an Article 38.075(a) instruction in the guilt-phase charge to the jury.  Because the court held that Article 38.075 did not apply to this case, it did not address the remaining two related issues raised on appeal.

Chief Justice Tom Gray wrote a detailed concurring opinion recognizing the close

---

[5] *Phillips v. State*, 436 S.W.3d 333, 338 (Tex. App.—Waco 2014, pet. granted).

[6] *Id.* (citing to *Fernandez v. State,* 396 S.W.2d 885, 886 (Tex. Crim. App. 1965) ("We do not agree with the State that appellant's attempt to get two witnesses to testify that they had seen him at a certain location on the day in question constitutes a declaration sufficient to corroborate the testimony of the accomplice witnesses and which tends to connect the appellant with the offense committed.")).

similarities between Article 38.075 and the accomplice-witness statute, Texas Code of Criminal Procedure Article 38.14. Justice Gray noted that in analyzing whether or not the accomplice-witness law can be applied by analogy to the instructions to be given in this jury charge for jailhouse-witness testimony, he believed that the majority's limitation on the applicability of Article 38.075 was too narrow to implement the purpose of the statute. In particular, he said, "limiting its application to 'admissions or confessions' is an improper limitation on the purpose for which the statute was designed." Chief Justice Gray opined that the trial court erred in failing to give a limiting instruction requiring corroboration of the jailhouse-witness testimony in this case. Yet, after determining that the error was harmless, Chief Justice Gray concurred in the decision to affirm the trial court's judgment of conviction.

## **ANALYSIS**

Our first duty in analyzing a jury-charge issue is to decide whether error exists.[7] If we find error, a harm analysis must then be done.[8] Phillips did not object to the jury charge, nor did he request an instruction be given to the jury tracking the language of Article 38.075(a). Nevertheless, a trial court must instruct the jury *sua sponte* on the "law applicable to the

---

[7] *Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).

[8] *Id.*; *see also*, *Saenz v. State,* 451 S.W.3d 388 (Tex. Crim. App. 2014) (holding that, when appellant does not object to the jury charge, the case will be remanded to the court of appeals so that the trial court's error can be analyzed for egregious harm under *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

case."[9] Thus, Phillips was able to raise the issue on appeal that the trial court erroneously omitted from the jury charge a jailhouse-witness instruction pursuant to Article 38.075(a), even though there was no objection to the content of the jury charge as given or to the omission of a necessary instruction.

In determining whether Article 38.075(a) applies to the facts of this case, the only question before us is whether Diggs and/or Slaughter testified to any statements Phillips made to them that were against Phillips' interest. Because our answer to that question is "yes," we find that the trial court erroneously omitted a jailhouse-witness instruction that should have been given pursuant to Article 38.075(a).

## A.    What Is "A Statement Against The Defendant's Interest?"

In construing statutory language, "we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment."[10] However, where the language of the statute is not plain, but rather ambiguous, a court may consider "such extra-textual factors as executive or administrative interpretations of the statute or legislative history."[11] In this context, ambiguity exists when

---

[9] *Oursbourn v. State,* 259 S.W.3d 159, 180 (Tex. Crim. App. 2008) (holding that the trial court was under a duty to instruct the jury *sua sponte* in accordance with Article 38.075, which requires corroboration of testimony of person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility).

[10] *Whitfield v. State,* 430 S.W.3d 405, 408 (Tex. Crim. App. 2014) (citing to *Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)).

[11] *Mahaffey v. State,* 346 S.W.3d 908, 913 (Tex. Crim. App. 2012) (citing to *Boykin,* 818 S.W.2d at 785-86).

a statute may be understood by reasonably well-informed persons in two or more different senses; conversely, a statute is unambiguous where it reasonably permits no more than one understanding.[12]

Article 38.075 does not define or explain what the phrase "statement against a defendant's interest" means. Reasonably well-informed persons could interpret that phrase in more than one sense. One interpretation, given by the court of appeals, is that, for a statement to be against the defendant's interest, it must tend to connect him with the charged offense.[13] A second interpretation gives the term "statement against interest" the same meaning given in Texas Rule of Evidence 803(24).[14] A third interpretation gives the phrase a broad meaning, being any statement or assertion made by a party to a case and offered

---

[12] *Id.* (citing to *State v. Neesley*, 239 S.W.3d 780, 783 (Tex. Crim. App. 2007).

[13] *Phillips,* 436 S.W.3d at 338 ("'the testimony of a person to whom the defendant made a statement against the defendant's interest' must, at a minimum, tend to connect the defendant with the offense committed . . .").

[14] Texas Rule of Evidence 803(24) provides that a "statement against interest" is not excluded by the hearsay rule and defines it as "a statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *See Walter v. State,* 267 S.W.3d 883, 890 (Tex. Crim. App. 2008) ("the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability").

against that party.[15] Because the plain language is ambiguous, we consider extra-textual factors.

## B.  **Extra-textual Factors**

Article 38.075 was enacted in recognition that incarcerated individuals have an incentive to provide information against other incarcerated individuals and that this testimony should be corroborated.[16] Article 38.075's legislative history recognizes that "[t]he veracity of an in-custody informant's statement can be highly suspect," and that "[t]he testimony of [an] in-custody informant" should be corroborated by at least one other piece of evidence.[17] Jailhouse-witness testimony is inherently unreliable due to the inmate's incentive to better his circumstances.

---

[15] At one time, Black's Law Dictionary defined "against interest" as simply being "adverse to [one's] position." BLACK'S LAW DICTIONARY 31 (Abridged 5th ed. 1983). The current version of Black's does not define "against interest," but defines "statement against interest" as a "declaration against interest" or an "admission against interest." BLACK'S LAW DICTIONARY 1629 (10th ed. 2014). A "declaration against interest" is defined as "a statement by a person who is not a party to a suit, discussing a matter that is within the declarant's personal knowledge and is adverse to the declarant's pecuniary, proprietary, or penal interest." *Id.* at 494. An "admission against interest" is defined, in pertinent part, as "any statement or assertion made by a party to a case and offered against that party." *Id.* at 56. This is a somewhat roundabout evolution of the definition, "adverse to [one's] position," since a statement is typically not going to be offered against a party at trial unless it is adverse to that party's position.

[16] Senate Comm. On Criminal Justice, Bill Analysis, Tex. S.B. 1681, 81st Leg., R.S. (2009).

[17] *Id. See also,* House Research Organization, Bill Analysis, Tex. S.B. 1681, 81st Leg., R.S. (2009) ("Supporters say [that] . . . because jailhouse informants have a strong incentive to fabricate confessions or incriminating evidence in exchange for lighter sentences or the goodwill of the criminal justice system, it is important to make sure that their testimony is corroborated by at least one additional piece of evidence.").

Similarly, accomplice-witness testimony must be corroborated because it is inherently unreliable due to the strong likelihood of finger-pointing.[18] The testimony of an accomplice witness is untrustworthy, and it should be received, viewed, and acted on with caution.[19] In *Edwards v. State,[20]* this Court noted that, "the test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense."

Just as Article 38.14 was enacted to address how to handle accomplice-witness testimony, Article 38.075 was enacted to similarly address the unreliability of jailhouse-witness testimony. However, we are not being called upon to decide whether there was sufficient corroboration of the jailhouse-witness testimony of Diggs and Slaughter. Unlike the accomplice-witness rule (Article 38.14), which requires an instruction in the jury charge if the accomplice witness testifies at all, the jailhouse-witness rule (Article 38.075(a)) requires a jury instruction only if the jailhouse witness testifies about a statement made by the defendant that was against the defendant's interest.

---

[18] TEX. CODE CRIM. PROC. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . ."); *Walker v. State,* 615 S.W.2d 728, 731 (Tex. Crim. App. 1981).

[19] *Id.*

[20] 427 S.W.2d 629 (Tex. Crim. App. 1968).

**C.     Were Phillips' Statements "Against [His] Interest?"**

The appellate court used the corroboration language in Article 38.075(a)[21] to determine whether a statement made by a defendant was, in fact, against his interest. In other words, the court of appeals held that if the corroborating evidence must tend to connect the defendant with the offense committed, then whatever the defendant said to the jailhouse witness must do so also, thereby seemingly equating a "statement against the defendant's interest" under Article 38.075(a) with a statement that must tend to connect the defendant with the offense committed. Relying on *Fernandez v. State*,[22] the court of appeals concluded that, because Phillips' statements to Diggs and Slaughter did not tend to connect Phillips to the aggravated robbery, they were not against his interest. In *Fernandez,* the purported evidence—that Fernandez attempted to get two witnesses to testify that they had seen him at a certain location on the day in question—was evaluated on whether or not it sufficiently corroborated other accomplice-witness testimony, not whether such evidence was a statement against Fernandez's interest. Yet, the rules of procedure can apply differently to the same piece of evidence, depending upon how such evidence is to be used. A statement made by a defendant may be interpreted as being against that defendant's interest (under Article 38.075(a)) even though such statement may not be legally sufficient evidence, on its own,

---

[21] The corroboration language in Article 38.075(a) dictates that the testimony of a person to whom the defendant made a statement against the defendant's interest must be "corroborated by *other* evidence tending to connect the defendant with the offense committed." (Emphasis added).

[22] 396 S.W.2d at 886.

to corroborate accomplice-witness testimony (under Article 38.14). We find, therefore, that the appellate court's interpretation of what it means to be "a statement against the defendant's interest" is too narrow.

Both sides have taken the position that a statement against a defendant's interest for purposes of Article 38.075(a) should be determined in accordance with Texas Rule of Evidence 803(24). And, while Phillips and the State agree that statements that would tend to subject a person to criminal liability would constitute a "statement against interest" under both Rule 803(24) and Article 38.075(a), Phillips argues that his statements to Diggs and Slaughter did expose him to criminal liability, and the State argues that they did not. Because there is nothing in the plain language of Article 38.075(a) expressly limiting its application to "statements against interest" that are admissible pursuant to Rule 803(24), we decline to impose such a limitation. We conclude that a statement made by a defendant to a jailhouse witness can be against his interest even if it does not expose him to criminal liability.[23]

In enacting the jailhouse-witness statute, it appears that the legislature was concerned not only with whether the content of the statement made to that witness was trustworthy, but also with whether the jailhouse witness himself was trustworthy. Therefore, although there

---

[23] Moreover, the admissibility of Phillips' statements to Diggs and Slaughter under Rule 803(24) is not an issue before this Court. There was no objection to the testimony offered into evidence and no discussion of the basis for its admissibility. Therefore, we express no opinion on the admissibility of that evidence. The jury was free to consider the testimony for any purpose. Because the testimony was admitted without any limitation on its use, the State was entitled to argue, and did argue, that Phillips' statements to Diggs and Slaughter were evidence of his guilt.

is nothing included within the legislative history that expressly clarifies what constitutes a "statement against the defendant's interest," we hold that the purpose behind Article 38.075(a) would be best achieved by giving that term the broadest possible meaning—a statement that is against a defendant's interest is one that is adverse to his position.

Diggs' testimony indicated that Phillips "tried to get him to say" that he (Diggs) heard Dulin admit to committing the robbery on his own. Slaughter testified that Phillips asked him to sign an affidavit that he (Slaughter) heard Dulin say that Dulin was going to try to shift all the blame to Phillips. Slaughter summarized his own testimony saying that Phillips was trying to get him to lie about who committed the robbery so that it would seem like Dulin committed the robbery by himself. Diggs' and Slaughter's testimony could be interpreted as evidence that Phillips somehow tried to persuade them to say that they heard Dulin make comments indicating that Dulin committed the robbery on his own—in other words, that Phillips asked them to lie in order to help his position. That was precisely what the State argued to the jury: "Does an innocent person go around the jail asking people he's just met to sign affidavits and lie for him?"[24] We find that Phillips' purported requests of Diggs and

---

[24] Such position taken by the State in closing argument is in stark contrast to the position the State now takes, which is that Phillips' statements to Diggs and Slaughter were merely exculpatory, did not subject him to criminal liability, and thus were not statements against his interest requiring corroboration and an Article 38.075(a) instruction. The State cites to *Miles v. State,* 918 S.W.2d 511, 515 (Tex. Crim. App. 1996) (holding that exculpatory statements do not subject a defendant to criminal liability); *Trevino v. State,* 218 S.W.3d 234, 250 (Tex. App.—Houston [14th Dist.] 2007) (finding that blame-shifting does not expose a defendant to criminal liability); and *Kennedy v. State*, 184 S.W.3d 309, 316-18 (Tex. App.—Texarkana 2005, pet. ref'd) (holding that attempts to have witnesses "get their stories straight" do not expose a defendant to criminal liability). However, these cases involve the admissibility of evidence under Rule 803(24), and thus we find them inapplicable to our analysis.

Slaughter to lie for him were offered against Phillips at trial, can most certainly be interpreted as being adverse to his position, and thus were statements made by Phillips to Diggs and Slaughter while they were incarcerated together that were against Phillips' interest.

## CONCLUSION

We hold that the trial court erred by not including an instruction in the jury charge pursuant to Article 38.075(a). Because the court of appeals has not had the opportunity to conduct a harm analysis under the *Almanza* standard, or to address Phillips' second and third issues raised on appeal, we vacate its judgment and remand this case to the court of appeals for further proceedings.

DELIVERED: June 3, 2015
PUBLISH