**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00328-CR**
_____

**THOMAS NOLAN WHITE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-04-05780-CR**

**OPINION**

A jury convicted appellant Thomas Nolan White of fraudulently possessing items of identifying information and assessed punishment at ten years of confinement.[1] *See* Tex. Penal Code Ann. § 32.51(c)(1). In his sole appellate issue, White argues that the trial court reversibly erred by failing to *sua sponte* instruct the

---

[1]White's punishment range was enhanced to the punishment range for a second-degree felony because he had two prior felony convictions.

1

jury that it could disregard any evidence it concluded police had illegally obtained.[2]

For the reasons explained herein, we affirm the trial court's judgment.

BACKGROUND

Before trial, White filed motions to suppress the stop of his vehicle, as well as the search of his vehicle after a narcotics dog allegedly alerted. White asserted, among other things, that although police officers stated that the narcotics dog alerted to the vehicle, "you do not see the dog alert on the vehicle in the video." White argued that officers lacked probable cause to stop his vehicle and search it. The trial judge did not rule on the motions before trial.

At trial, Sergeant Jesse Bullinger of the Montgomery County Precinct Four Constable's Office testified that he has been a certified K-9 handler for approximately six years. Bullinger explained that on the evening in question, he was working his usual patrol shift with a deputy. According to Bullinger, he was assisting with an unrelated traffic stop when he saw a truck coming down the road, and the truck's lights "appeared to be strange from a distance." As the vehicle drew closer, Bullinger observed that the vehicle's headlights were not working, and two flashlights were strapped to the hood to serve as makeshift headlights. Bullinger

---

[2]White did not raise appellate issues regarding the denial of his motions to suppress or the existence of probable cause. Rather, he only complains that article 38.23 obligated the trial court to *sua sponte* instruct the jury that it was free to disregard evidence from an illegal search. *See* Tex. Code Crim. Proc. Ann. art. 38.23.

2

testified that he initiated a traffic stop because the driver "was operating a vehicle with no headlights in the middle of the night[,]" in violation of the traffic laws.

According to Bullinger, when he stopped the vehicle, White acted nervous and defensive, and White "started kind of reaching around inside the vehicle[.]" Bullinger explained that he eventually asked White for consent to search the vehicle because of White's nervous behavior. Bullinger testified that when he asked White if he minded if Bullinger searched the vehicle, White said "no," and Bullinger explained that he engaged in a back and forth with White to clarify whether White was consenting or refusing. When he was unable to obtain a clear response from White, Bullinger deployed his narcotics dog, Harley Quinn. Bullinger explained that when a narcotics dog alerts, "you can kind of see some changes in their behavior, whether it is their tail straightening or wagging more. Or Harley likes to put her ears back sometimes. There [are] lots of different signs. . . . And when they give a final passive positive alert, [it] is a sit." According to Bullinger, if the dog smells the odor of narcotics, "she will stop and then work the odor." Bullinger testified that the dog will "finalize the alert with a sit."

When asked what "area of the car" the dog alerted on, Bullinger testified, "[the] driver's side door[,]"  and Bullinger believed he had probable cause to search White's vehicle. A video of the stop, including the deployment of the dog, was admitted into evidence without objection and published to the jury. While the video

3

was being published to the jury, Bullinger explained that the dog froze, and then she sat. According to Bullinger, the dog did "a passive sit." At the bench, the prosecutor mentioned that defense counsel had filed motions to suppress both the stop and the dog sniff, and he advised the trial judge that "[t]he next phase of the testimony is going to be introducing evidence that was gotten from the search of the vehicle."

Outside the presence of the jury, the trial court conducted a hearing on the motions to suppress. Defense counsel argued that he could not see the dog sitting down on the video. According to defense counsel, the dog "might sit down at the very, very front of the car, but you can't even see that." The prosecutor responded that the video does show the dog sweep the vehicle and stop on her own without the handler, and the other deputy who was with Bullinger also said that the dog sat. The trial judge stated, "at one point it is obvious that the dog is away from the handler and is in front of the vehicle." The prosecutor stated that "you have a credible officer on the witness stand who is swearing under oath that the dog alerted[,]" and he contended that "even absent a video, just based on Sergeant Bullinger's testimony alone, the Court would find that the dog actually alerted to the presence of narcotics." The prosecutor argued that the dog's alert provided probable cause to search White's vehicle. The trial court orally denied White's motions to suppress and signed a written order on the same date.

The State introduced two videos into evidence: State's Exhibit 2, which showed the beginning of the stop of White's vehicle, and State's Exhibit 4, which showed more of Bullinger's interaction with White and the deployment of the dog. Both videos are dash cam recordings from the other deputy's vehicle, which was parked directly behind White's vehicle. The rear of White's vehicle is clearly visible, but the sides of his vehicle are not. State's Exhibit 4 shows Bullinger circling White's vehicle with the dog, but the dog is not always visible on the video due to the angle and the degree of illumination. When the other deputy says on the video that the dog alerted, only the dog's head is visible at the front of the car, and when Bullinger offers the dog a tennis ball as a reward, the dog jumps up into view. It is difficult to tell how close the dog is to the driver's side door when Bullinger and the other deputy said the dog alerted.

Bullinger explained that after the dog alerted, he searched the vehicle, starting at the front driver's door. A glass pipe, which Bullinger testified is commonly used to smoke methamphetamine, was recovered from underneath the driver's seat of White's vehicle, and the pipe was admitted into evidence. Also recovered from the back seat of White's vehicle and admitted into evidence were a Visa card belonging to S.C., a MasterCard belonging to D.N., a Visa card belonging to T.N., a MasterCard belonging to J.P., a MasterCard belonging to J.W., a Social Security card belonging to T.L., a Texas driver's license belonging to J.L., a MasterCard

5

belonging to D.B., a Social Security Card belonging to S.P., and a Visa card belonging to E.H.[3] Bullinger explained that he was able to make contact with S.C., and S.C. informed Bullinger that her credit card had been taken in a burglary.[4]

S.C. testified that an officer called to inform her that her "debit card was found on someone." According to S.C., the card had been stolen during a burglary. S.C. explained that she was unaware of any link between White and the burglary. S.C. testified that she did not give White permission to possess her card. The State rested after S.C.'s testimony.

White testified that he found S.C.'s card in the glove box of a vehicle he had purchased. White explained that he never attempted to use the card. White testified that he knows some of the other people whose cards were found in his vehicle, and he testified that some of the cards arrived by mail. According to White, "none of it is fraudulent identification or credit cards. It is all prepaid and gift cards." When asked whether the dog ever sat "as far as you saw it[]" White responded, "No, sir." White testified, "I did not see [the dog] sit or mark on my vehicle. If anything, it was when he had it sit and go for the ball."

---

[3]To protect the privacy of the victims, we refer to the victims using their initials. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

[4]White was only charged with possessing the identifying information belonging to S.C.

The defense rested after White's testimony. During the charge conference, the trial judge noted that she had removed the portion of the proposed charge about the defendant's failure to testify because White elected to testify, and when she asked whether there was "anything else that either side saw on the rough draft that I need to fix[,]" defense counsel responded, "I don't think so." Defense counsel did not object to the charge. During closing argument, defense counsel contended that the dog never alerted, and "[t]he probable cause is gone." The prosecutor objected that the argument was improper because "[t]here is not a question or an instruction for the jury on this point[,]" and the trial court sustained the objection, but did not instruct the jury to disregard counsel's argument. When defense counsel again argued that if jurors disbelieved that the dog alerted, the police lacked probable cause, the prosecutor again objected, and the trial court sustained the objection, again without instructing the jury to disregard counsel's argument. During his rebuttal, the prosecutor argued, "I can tell you that this video shows him with headlights strapped to his hood. But you already know that. I could tell . . . you this dog alerted on that car. You know that too."

White did not request an article 38.23 charge. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (providing that evidence obtained in violation of the U.S. Constitution or the Texas Constitution shall not be admitted against a criminal defendant, and "the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence

7

was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained[]"). The charge submitted to the jury does not include an instruction to disregard any evidence the jury believed was illegally obtained. During its deliberations, the jury sent the following written question to the trial judge: "Are we to consider that there was a [sufficient] probable cause for search of the vehicle as part of the charge?" In her written response to the question, the trial judge instructed the jury to "only consider the instructions in the charge and continue deliberations." The jury found White guilty, found the two enhancement paragraphs in the indictment to be true, and assessed punishment at ten years of confinement.

## WHITE'S SOLE ISSUE

In his sole appellate issue, White argues that the trial court reversibly erred by failing to *sua sponte* instruct the jury concerning the narcotics dog's alert on White's vehicle, which led to the discovery of all the incriminating evidence. Specifically, White contends he was entitled to such an instruction because "an issue of fact affecting the admissibility of all the evidence used to convict was raised." Additionally, White asserts that the trial court's failure to *sua sponte* instruct the jury egregiously harmed him.

When reviewing alleged charge error, we determine whether error existed in the charge and, if so, whether sufficient harm resulted from the error to compel

8

reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005); *see also Phillips v. State*, 463 S.W.3d 59, 64-65 (Tex. Crim. App. 2015). When evidence is admitted that creates a question regarding whether evidence is the fruit of an illegal search, "'the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this [a]rticle, then and in such event, the jury shall disregard any such evidence so obtained.'" *Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012) (quoting Tex. Code Crim. Proc. Ann. art. 38.23(a)).

When, as here, the defendant does not object to the alleged charge error at trial, we may reverse the judgment only if the error was so egregious that the defendant did not receive a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). Errors that result in egregious harm are those that affect the "'very basis of the case,' deprive the defendant of a 'valuable right,' or 'vitally affect a defensive theory.'" *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996), *overruled on other grounds by Gelinas v. State*, 398 S.W.3d 703 (Tex. Crim. App. 2013). "Egregious harm is a difficult standard to prove[,] and such a determination must be done on a case-by-case basis." *Id*. The egregious harm inquiry under *Almanza* is fact specific and "should be done on a case-by-case basis." *Gelinas*, 398 S.W.3d at 710. "[T]he record must show that a defendant has suffered

actual, rather than merely theoretical, harm from jury instruction error." *Ngo*, 175 S.W.3d at 750.

In assessing the degree of harm, we must consider the entire jury charge, the state of the evidence, including contested issues and the weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171; *see also Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). We must examine the charge in its entirety rather than as a series of isolated statements. *Holley v. State*, 766 S.W.2d 254, 256 (Tex. Crim. App. 1989); *Iniguez v. State*, 835 S.W.2d 167, 170 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd).

We need not decide whether the trial court's failure to include a 38.23 charge was erroneous because, assuming without deciding that it was, the record does not show that White suffered egregious harm, as explained herein. *See Almanza*, 686 S.W.2d at 172; *Davis v. State*, 490 S.W.3d 268, 274 (Tex. App.—Fort Worth 2016, pet. ref'd) (Appellate court assumed error and addressed harm in deciding charge error issue.); *see also generally Strickland v. Washington*, 466 U.S. 668, 700 (1984) (holding that, with respect to a claim of ineffective assistance of counsel, defendant's failure to make the required showing as to either the deficient attorney performance prong or the prejudice prong defeats the claim of ineffectiveness).

White argues that he was egregiously harmed by the omission of an instruction to disregard illegally obtained evidence because the omission "excluded" the jury from determining the admissibility of the evidence. White also asserts that he was egregiously harmed by the trial court's failure to instruct the jury pursuant to article 38.23 because the jury was presented with "an overwhelming number of incriminating items[,]" and "[w]ithout an alternative option for the jury to determine a fact significant to the legality of the search, they had no reasonable choice but to convict Appellant." White further argues that both parties made the legality of the evidence an issue during trial. According to White, without an article 38.23 instruction, the jury lacked a mechanism to consider the legality of the search of White's vehicle, and "the State was relieved of establishing that the search was reasonable." Lastly, White argues that the jury's written question to the trial court demonstrates "actual harm."

Under the first *Almanza* factor, we must determine whether White suffered egregious harm by considering the alleged error in light of the totality of the charge. *See Almanza*, 686 S.W.2d at 171. The charge correctly set forth the elements of the offense of fraudulent possession of identifying information and correctly defined the pertinent statutory terms. *See* Tex. Penal Code Ann. § 32.51(b).[5] The charge also

---

[5]Section 32.51(b) of the Texas Penal Code provides that a person commits an offense if, "with the intent to harm or defraud another, obtains, possesses, transfers, or uses an item of: (1) identifying information of another person without the other

accurately set forth the circumstances under which a person is presumed to have the intent to harm or defraud another. *See id.* § 32.51(b-1)(1). In addition, the charge instructed the jury to find White not guilty unless it found the elements of the offense beyond a reasonable doubt, and it informed the jury that the State had the burden of proof throughout trial and as to each element of the offense. Moreover, the charge instructed the jury regarding the presumption of innocence. Furthermore, the charge instructed the jury that although it is the exclusive judge of the facts proved, the credibility of witnesses, and the weight to be given to their testimony, it is governed by the law set forth in the written instructions. As discussed above, the charge did not instruct the jury to disregard evidence it concluded was illegally obtained.

Given that the charge correctly instructed the jury regarding the applicable law, including the burden of proof and the presumption of innocence, and instructed the jury that it is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given their testimony, we cannot conclude that White suffered egregious harm from the omission of an instruction to disregard evidence the jury concluded was illegally obtained. The jury's written question did not ask whether it should determine the sufficiency of the evidence of probable cause. Rather, the jury's question asked whether it was to "consider that there was a

_____

person's consent; (2) information concerning a deceased natural person . . . ; or (3) identifying information of a child younger than 18 years of age." Tex. Penal Code Ann. § 32.51(b).

12

[sufficient] probable cause for search of the vehicle as part of the charge?"; that is, the jury's question seemed to presume that probable cause existed. In response to the jury's question, the trial court did not instruct the jury not to consider probable cause, but simply referred the jury to the charge. For all these reasons, we conclude that the first *Almanza* factor weighs against a finding of egregious harm. *See Almanza*, 686 S.W.2d at 171.

With respect to the second *Almanza* factor, the state of the evidence, including contested issues and the weight of probative evidence, the issue of whether the evidence was legally obtained was clearly contested at trial. *See id.*; *see also Villarreal*, 453 S.W.3d at 433. However, "the mere existence of conflicting testimony surrounding a contested issue does not necessarily trigger a finding of egregious harm." *Villareal*, 453 S.W.3d at 436. Although White testified that he "did not see" the dog alert on his vehicle, neither the videos admitted into evidence nor the testimony of either White or Bullinger established that White was able to fully observe the dog walking around his vehicle, that the dog never alerted, or that White knew what constituted an alert from the dog. Most of White's testimony was focused on his attempts to explain why he possessed the items of identifying information and his assertion that he lacked the requisite intent to harm or defraud. Bullinger testified that the dog alerted on White's vehicle, which was also confirmed by the other deputy on the video. Viewing the state of the evidence, including contested issues

13

and the weight of probative evidence, we conclude that the second *Almanza* factor weighs against a finding of egregious harm. *See Almanza*, 686 S.W.2d at 171; *see also Villarreal*, 453 S.W.3d at 436.

We turn now to the third *Almanza* factor, the arguments of counsel. *See Almanza*, 686 S.W.2d at 171; *see also Villareal*, 453 S.W.3d at 433. During his opening statement, the prosecutor argued that after Bullinger asked White for consent and White "waffle[d] back and forth and back and forth" about whether he would consent to a search of his vehicle, Bullinger decided to have his K-9 do an open-air sniff around White's vehicle. The prosecutor argued that the dog circled the vehicle and sat next to the driver's side door, and "Sergeant Bullinger knows what that means." According to the prosecutor, Bullinger decided he had probable cause to search White's vehicle, and when he searched, he found identifying information belonging to S.C. The prosecutor argued, "That is our case. That's what you should expect to see."

During his closing argument, the prosecutor argued briefly, stating that he would not take much time because he did not need to do so. The prosecutor asserted, "you can either believe that all of those things came together in a perfect storm of consequence to make an innocent Thomas White look guilty; or you can believe that it just is exactly what it looks like." During his closing argument, defense counsel argued that White had just purchased his vehicle, and "[t]here could have been things

14

in there that he didn't even realize . . . were in there." Defense counsel argued that "the weakness of this case is 'intent to harm.' That's what you are going to have to figure out." In addition, defense counsel emphasized that White did not attempt to use the card, which "absolutely obliterates the intent to defraud." Defense counsel argued that regardless of the number of items of identifying information that White possessed, "[i]t doesn't make any difference if you don't have the intent to defraud." Moreover, defense counsel argued that intent should not be presumed despite the number of cards in White's possession.

> Defense counsel then argued as follows:

> Let's talk about that dog for a minute. That dog has been wrong seven times in the past. . . . He alerted and then they found nothing. When I look at this, I see the dog go around the car, never alerting. And you don't see him on the back, you don't see him on the right, you don't see him on the front. You only see one quarter of the search. . . . He is at least 3 feet away from the car because you can't see him on the video. A dog is not going to alert on a car 3 feet away. He has got to put his nose right up to it. . . . He alerted incorrectly. . . . The dog never alerts. What does that do to this whole case? The probable cause is gone. The police do not have the right to search . . . anything without probable cause.

As discussed above, the prosecutor objected that defense counsel's argument was improper because "[t]here is not a question or an instruction for the jury on this point[,]" and the trial judge sustained the objection, but did not instruct the jury to disregard defense counsel's argument. Defense counsel then argued to the jury that "if you go back there and you say I don't believe that dog, that dog is wrong, you

15

have no probable cause – you can do that." The prosecutor objected, and the trial court sustained the objection, but again did not instruct the jury to disregard defense counsel's argument. Defense counsel then resumed arguing that although there is evidence White possessed items of identifying information, there is no evidence of intent to harm or defraud. During rebuttal, the prosecutor argued regarding the presumption of intent to harm and exhorted the jury to follow the law. The prosecutor further argued, "I can tell [you] that [] this video shows [White] with headlights strapped to his hood. But you already know that. I could tell you that this dog alerted on that car. You know that too. I just don't know what else to say, other than follow the law[.]" The prosecutor concluded his argument by instructing the jury to follow the law and not to allow the victim to "get lost in all of this."

Neither the prosecutor nor defense counsel misstated the law during argument. In addition, the State did not mention the evidence regarding the dog during its closing argument; rather, the State mentioned the issue during rebuttal, in response to defense counsel's argument. Viewing the parties' arguments in their entirety, we conclude that the third *Almanza* factor weighs against a finding of egregious harm. *See Almanza*, 686 S.W.2d at 171.

The fourth *Almanza* factor requires us to consider any other relevant information revealed by the record. *Id*. We find no other relevant information revealed by the record beyond what we have already discussed in our analysis. We

16

therefore conclude that the fourth *Almanza* factor does not weigh in favor of finding that the omission of a 38.23 instruction egregiously harmed White. *See id*. Having concluded that each of the four *Almanza* factors weighs against finding egregious harm, we overrule White's sole issue and affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on June 24, 2021
Opinion Delivered August 25, 2021
Publish

Before Golemon, C.J., Horton and Johnson, JJ.

17