

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00517-CR

LASHYLA ALVAREZ SCHOONOVER                                    APPELLANT

V.

THE STATE OF TEXAS                                                STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
TRIAL COURT NO. 1338474D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

A jury convicted Appellant Lashyla Alvarez Schoonover of murder and assessed her punishment at thirty years' confinement and a $10,000 fine. *See* Tex. Penal Code Ann. § 19.02(b)(1), (c) (West 2011). The trial court sentenced her accordingly. In two points, Schoonover argues that the trial court erred by

---

[1]*See* Tex. R. App. P. 47.4.

not giving a jailhouse-witness instruction and by admitting hearsay testimony over the objection of Schoonover's trial counsel. We will affirm.

## II. FACTUAL BACKGROUND

On July 15, 2013, Schoonover and three other individuals—Jamie Corley, Chauncey McCallum, and Richard Hernandez—spent the day together driving around the Dallas-Fort Worth Metroplex. The group ran several errands, including buying methamphetamine and Xanax. As nighttime approached, the group made their way to an apartment complex in Fort Worth. Hernandez went into an apartment where methamphetamine was being sold while the others waited in the car.[2] After doing drugs inside the apartment, Hernandez went back to the car, and the group began to leave the apartment complex. As they were leaving, Hernandez told McCallum that Lawrence Gomez was inside the apartment. This upset McCallum as he believed that Gomez had recently pulled a gun on one of his friends. McCallum ordered Hernandez to drive the car back to the apartment; Hernandez complied. Hernandez parked the car again at the complex, and Hernandez, McCallum, and Schoonover discussed how they could get Gomez to exit the apartment. Ultimately, they decided to ask Sam Chrouk, one of the individuals selling drugs out of the apartment, to try to get Gomez out of the apartment.

---

[2]While Hernandez was inside the apartment, Schoonover may have briefly exited the car to use the restroom.

Hernandez went back to the apartment and asked Chrouk to speak with him outside. The two of them went outside and Hernandez told Chrouk that one of the individuals in the car had a problem with one of the individuals inside the apartment.[3] Chrouk then spoke with McCallum, who told Chrouk that the problem could be addressed either outside or would be dealt with inside the apartment. As Chrouk did not want any trouble inside the apartment, he went into the apartment and told the people present that McCallum had a problem with one of them and that that person needed to go outside to address it. When no one inside the apartment did anything, Chrouk went back outside.

According to Chrouk, McCallum and Schoonover came up to him, and he explained that no one was coming out of the apartment and that he did not want any trouble. Gomez then walked out of the apartment and approached McCallum and Schoonover. Chrouk testified that he saw Gomez reach out to shake McCallum's hand. Chrouk then turned and began walking back to the apartment when he heard two gunshots followed by multiple gunshots; Chrouk could not identify the shooter. Chrouk then ran back to the apartment; Gomez also made his way back to the apartment where he opened the door and collapsed. Gomez died from two gunshot wounds he had sustained.

Corley, one of the individuals inside the car, also testified about the events leading up to Gomez's murder. Corley testified that McCallum exited the car

_____

[3]Gomez's name was not mentioned during the conversation between Hernandez and Chrouk.

after a conversation with Chrouk. She assumed that McCallum was carrying a gun as she had seen him with one earlier in the day. Corley testified that she saw McCallum yelling at someone but she could not see who. According to Corley, Schoonover then reached into her purse, pulled out a gun, and exited the vehicle. Shortly after Schoonover exited the vehicle, Corley heard "four or five" gunshots but did not see who fired the gun. Corley stated that when Schoonover and McCallum returned to the vehicle they were laughing and high-fiving.

Corley testified that later that evening she, Schoonover, and Hernandez went back to Schoonover's apartment and smoked methamphetamine. Corley fell asleep and awoke to hear Schoonover asking Hernandez whether anything needed to be done about Corley because Schoonover feared that Corley might "snitch." Hernandez vouched for Corley, telling Schoonover that nothing needed to be done. Corley testified that the next day she had a conversation with Schoonover where Schoonover stated that she had shot Gomez because McCallum "wasn't going to do nothing." Schoonover told Corley that she started shooting first and that McCallum fired shots afterward.

The day after the shooting, the police, in response to a robbery call, stopped a vehicle in which McCallum was a passenger. As the vehicle smelled strongly of marijuana, the police searched it and found three handguns, including a Beretta nine millimeter. Schoonover had purchased the Beretta nine millimeter eight days prior to Gomez's shooting. The police recovered from the crime scene nine .40 caliber bullet casings and three nine millimeter bullet casings. Dr.

4

Nazim Peerwani, Tarrant County's chief medical examiner, testified that Gomez died from two fatal gunshot wounds, one to the chest and one to the back. Lillian Lau, a senior forensic scientist with the Fort Worth Police Department's crime lab, testified that the two bullets recovered from Gomez's body were both fired by Schoonover's Beretta nine millimeter.

### III. JURY INSTRUCTION REGARDING JAILHOUSE WITNESS

In her first point, Schoonover argues that the trial court erred by not submitting a jury instruction regarding the testimony of a jailhouse witness as set out in article 38.075 of the Texas Code of Criminal Procedure. Schoonover argues that the testimony of Kristina Harris, an inmate who was incarcerated with Schoonover while Schoonover awaited trial, warranted a jailhouse-witness instruction. Harris testified that Schoonover typically did not like to talk about her case but that on Harris's last day in county jail, an opportunity arose for the two of them to discuss it. While Harris was saying goodbye to Schoonover, Harris mentioned that the last time she had been in the holding cell there was a woman she did not like named "Jaime." After discussing the physical characteristics of "Jaime," Schoonover realized that Harris was referring to Jamie Corley, and Schoonover told Harris that Corley was the "prosecutor's whole case" against her. According to Harris, Schoonover then asked her if she knew where Corley lived because she "want[ed] her gone." Harris also testified that Schoonover told

5

her that she had misgivings about Corley's presence during Gomez's murder but that she had been reassured that Corley's presence was fine.[4]

The trial court did not include a jailhouse-witness instruction in its jury charge. Schoonover did not object to the charge that was submitted to the jury.

## A. Standard of Review

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error occurred, whether it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). The appropriate inquiry for egregious harm is a fact specific one that must be performed on a case-by-case basis. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence,

---

[4]The identity of the individual who reassured Schoonover that Corley's presence was fine is unclear from Harris's testimony.

including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

## B. The Law

Article 38.075 of the Texas Code of Criminal Procedure, referred to as the jailhouse-witness rule, provides:

> (a) A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed. In this subsection, "correctional facility" has the meaning assigned by Section 1.07, Penal Code.
>
> (b) Corroboration is not sufficient for the purposes of this article if the corroboration only shows that the offense was committed.

Tex. Code Crim. Proc. Ann. art. 38.075 (West Supp. 2015).

A trial court must sua sponte include an article 38.075 jailhouse-witness instruction when applicable to the case. *Phillips v. State*, 463 S.W.3d 59, 65 (Tex. Crim. App. 2015); *Brooks v. State*, 357 S.W.3d 777, 781 (Tex. App.—

7

Houston [14th Dist.] 2011, pet. ref'd). A trial court errs by not giving a jailhouse-witness instruction when a witness testifies to a statement made by a defendant to the witness when both were confined in the same correctional facility and the statement is against the defendant's interest. *Phillips*, 463 S.W.3d at 65; *Brooks*, 357 S.W.3d at 781.

When a trial court errs by not giving a jailhouse-witness instruction, a reviewing court must eliminate the jailhouse witness's testimony from consideration and then examine the remaining portions of the record to see if there is evidence connecting the defendant with the commission of the crime. *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi 2011, no pet.); *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd); *Brooks*, 357 S.W.3d at 782. The remaining evidence is "sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Ruiz*, 358 S.W.3d at 680 (quoting *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011)). Under the egregious harm standard, the omission of a jailhouse-witness instruction is generally harmless unless the corroborating evidence is so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. *Brooks*, 357 S.W.3d at 781.

## C. Application of the Law to the Facts

Harris's testimony concerns statements against Schoonover's interest that Schoonover allegedly made to her while the two were confined in a correctional

8

facility. As such, a jailhouse-witness instruction should have been part of the jury charge, and the trial court erred by not including it.[5] *See Phillips*, 463 S.W.3d at 65; *Brooks*, 357 S.W.3d at 781. As Schoonover did not object to the jury charge, we will reverse only if the error resulted in egregious harm. *See Nava*, 415 S.W.3d at 298; *Almanza*, 686 S.W.2d at 171; Tex. Code Crim. Proc. Ann. art. 36.19.

Here, there is ample evidence—apart from Harris's testimony—to connect Schoonover to Gomez's murder. Corley testified that she heard gunshots shortly after Schoonover pulled a gun from her purse and exited the car. Corley also testified that Schoonover told her that she had shot Gomez. Chrouk testified that he saw Gomez approach Schoonover and McCallum right before Gomez was shot. Most notably, the two fatal bullets recovered from Gomez's body matched Schoonover's Beretta nine millimeter that she had purchased just eight days before the shooting.

Rational jurors could have found that this evidence sufficiently connected Schoonover to Gomez's murder. *See Ruiz*, 358 S.W.3d at 680. As there is corroborating evidence that connects Schoonover to Gomez's murder, the trial court's failure to give a jailhouse-witness instruction did not egregiously harm Schoonover. *See Brooks*, 357 S.W.3d at 782–84 (holding that the trial court's failure to give a jailhouse-witness instruction did not egregiously harm the

---

[5]The State seems to recognize that the trial court erred, as its brief delves straight into a harm analysis.

9

defendant where there was corroborating evidence tending to connect him to the crime). We overrule Schoonover's first point.

## IV. HEARSAY OBJECTION

In her second point, Schoonover argues that the trial court erred by admitting certain testimony over her counsel's hearsay objection. She points to the testimony of Detective William Paine, a detective in the Fort Worth Police Department's homicide unit, who interviewed Corley approximately a month after the shooting. At trial, the State asked Detective Paine, "[W]hat did [Corley] tell you?" Schoonover's counsel objected on hearsay grounds. The State responded that this testimony was being offered as a prior consistent statement to rebut an implied charge made by Schoonover's counsel during Corley's cross-examination that Corley had recently fabricated her testimony.

The trial court, after taking a recess to review the transcript of Corley's cross-examination, overruled the hearsay objection and granted Schoonover's request for a running objection to the alleged hearsay testimony. Detective Paine went on to testify about the statements Corley made to him. Schoonover admits that Detective Paine's recitation of what Corley told him is consistent with Corley's trial testimony, with only one difference—Corley told Detective Paine that she did not see Schoonover carrying a gun, while she testified at trial that she did see Schoonover carrying a gun.

## A. The Law

In general, a witness's prior statement that is consistent with the witness's trial testimony is inadmissible hearsay.  Tex. R. Evid. 613(c); *Bosquez v. State*, 446 S.W.3d 581, 585 (Tex. App.—Fort Worth 2014, pet. ref'd) (mem. op.).  A prior statement is admissible, however, to rebut an express or implied charge against the declarant of recent fabrication.  Tex. R. Evid. 801(e)(1)(B); *Bosquez*, 446 S.W.3d at 585.  "[T]here need be only a suggestion that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial."  *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (quoting *United States v. Casoni*, 950 F.2d 893, 904 (3d Cir. 1991)).  The fact that there needs to only be a suggestion of conscious alteration or fabrication gives the trial court substantial discretion to admit prior consistent statements.  *Id.* at 804–05.  To determine whether the cross-examination of a witness establishes an implied charge of recent fabrication, we focus on the "purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court."  *Id.* at 808 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 406, at 187 (2nd ed. 1994)).  We consider the totality of the record and may look to such clues as voir dire, opening statements, and closing arguments.  *Bosquez*, 446 S.W.3d at 585.

We review a trial court's determination that a prior consistent statement is admissible under an abuse of discretion standard.  *Hammons*, 239 S.W.3d at

11

806. A trial court does not abuse its discretion as long as the decision to admit the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

### B. Application of the Law to the Facts

Schoonover argues that Detective Paine's testimony regarding Corley's prior statement should not have been admitted because Corley's motive to fabricate her testimony was not recent, but rather was created at the outset of the case. The State counters that Schoonover implied that Corley's fabrication occurred after her statement to Detective Paine. The State points to the following questions asked by Schoonover's counsel during Corley's cross-examination:

> Q. [W]hat other parts of your story today are — are different than what you told detectives a year ago?
>
> . . . .
>
> Q. Okay. I mean, you have talked to [McCallum] about what happened, didn't you?
>
> A. I told him that [Schoonover] was putting the blame on him and that was it, so if they talk to you, talk.
>
> Q. Okay. And so I mean you and [McCallum] came up with this theory about [Schoonover] as a way to help protect [McCallum]; isn't that right?
>
> A. No. No. Not at all.
>
> Q. So this whole story here, this isn't your efforts to protect somebody that you cared about, whether it was — I guess just as friends or somebody that was more than that, but this was

your effort to come up with a way to try to push some of this blame off of [McCallum]?

During closing, Schoonover's counsel once again suggested that Corley fabricated her testimony to protect McCallum and reiterated that Corley's testimony differed from her earlier statement to Detective Paine. Schoonover's counsel told the jury:

Don't get sucked into the — into Corley's story.

. . . .

Do you really believe that there wasn't something more than what she told you [was] going on between her and [McCallum]? . . . You have got a guy in jail charged with murder, you are talking to him on the phone, what do you think you talk about? You don't talk about sports and the Rangers and the Mavericks and everything else. You are talking about what do we have to do to get this squared away for [McCallum] and [Hernandez]? What do we have to do — well, let's make it easy. Let's throw it on [Schoonover].

. . . .

But the biggest part of [Corley's] testimony is what she told you this time versus what she didn't tell Detective Paine.

The record reflects that Schoonover's counsel implied that Corley had recently fabricated her testimony. *See Hammons*, 239 S.W.3d at 807–08 (closing argument and cross-examination implied that witness had recently fabricated her testimony). We thus hold that the trial court did not abuse its discretion in admitting Detective Paine's testimony concerning Corley's prior consistent statements.

13

The trial court did err, however, in allowing Detective Paine to testify that Corley had told him that she did not see Schoonover carrying a gun on the night of Gomez's murder. That statement was not a prior consistent statement—as Corley testified that she saw Schoonover carrying a gun on the night of Gomez's murder—and should have been excluded as hearsay. While the trial court erred in admitting this hearsay testimony, such error was harmless, as the statement was beneficial to Schoonover in that it undermined Corley's credibility and suggested that Schoonover was not carrying a gun when she got out of the car to confront Gomez. *See* Tex. R. App. P. 44.2(b).

We overrule Schoonover's second point.

## V. CONCLUSION

Having overruled Schoonover's two points, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 10, 2015

14