**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00140-CR**
_____

**LIVELY JAMES STRATTON JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 19-33601**
_____

**MEMORANDUM OPINION**

A jury found Lively James Stratton Jr. ("Lively") guilty of capital murder of multiple persons and he was sentenced to confinement for life. *See* Tex. Penal Code Ann. § 19.03(a)(7). In four issues on appeal, Lively complains about the admission of evidence, sufficiency of the evidence, and jury charge error. We affirm the trial court's judgment.

PERTINENT BACKGROUND

The indictment alleged that on or about September 29, 2019, Stratton:

1

## PARAGRAPH ONE

then and there intentionally and knowingly cause the death of an individual, namely ELIJAH ISIAH RIDEAU, by shooting ELIJAH ISIAH RIDEAU with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely BOBBY LEE WYATT, by shooting BOBBY LEE WYATT with a firearm, and both murders were committed during the same criminal transaction,

## PARAGRAPH TWO

then and there intentionally and knowingly cause the death of an individual, namely ELIJAH ISIAH RIDEAU, by shooting ELIJAH ISIAH RIDEAU with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely SHANNON CHRISTOPHER SUTTON, by shooting SHANNON CHRISTOPHER SUTTON with a firearm, and both murders were committed during the same criminal transaction,

## PARAGRAPH THREE

then and there intentionally and knowingly cause the death of an individual, namely ELIJAH ISIAH RIDEAU, by shooting ELIJAH ISIAH RIDEAU with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely ALVIN LEE BELLARD, by shooting ALVIN LEE BELLARD with a firearm, and both murders were committed during the same criminal transaction,

## PARAGRAPH FOUR

then and there intentionally and knowingly cause the death of an individual, namely BOBBY LEE WYATT, by shooting BOBBY LEE WYATT with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely SHANNON CHRISTOPHER SUTTON, by shooting SHANNON CHRISTOPHER SUTTON with a firearm, and both murders were committed during the same criminal transaction,

## PARAGRAPH FIVE

then and there intentionally and knowingly cause the death of an individual, namely BOBBY LEE WYATT, by shooting BOBBY LEE WYATT with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely ALVIN LEE

2

BELLARD, by shooting ALVIN LEE BELLARD with a firearm, and both murders were committed during the same criminal transaction,

PARAGRAPH SIX

then and there intentionally and knowingly cause the death of an individual, namely SHANNON CHRISTOPHER SUTTON, by shooting SHANNON CHRISTOPHER SUTTON with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely ALVIN LEE BELLARD, by shooting ALVIN LEE BELLARD with a firearm, and both murders were committed during the same criminal transaction[.]

Since the State elected not to seek the death penalty, Lively's punishment was automatic life imprisonment or life imprisonment without parole. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 1(a).

Officer Shawn Tolley with the Beaumont Police Department testified that she oversaw the 9-1-1 office and the police dispatch office. Officer Tolley explained that two 9-1-1 calls concerning this case were recorded on September 29, 2019, and those calls were played to the jury. Both callers reported that they heard multiple gunshots in an upstairs apartment. One of the callers, E.L.,[1] who lived in the downstairs apartment, testified that the day before the shootings occurred, he saw Lively and Rideau arguing over a bag of pills that went missing, and Lively was very mad and upset with everyone upstairs. The next morning, E.L. heard Rideau arguing with

---

[1]To protect the privacy of the witnesses that testified concerning the murders, they are identified by their initials.

somebody on the phone, and he heard the other person "talking about coming back to shoot people."

After E.L. heard Rideau arguing on the phone, he saw Lively drive up, heard footsteps going upstairs and shots fired, and saw Lively drive off alone in his silver car. E.L. testified that he did not hear a confrontation or scuffle before the shots were fired. E.L. explained that within a "split second" of hearing someone knock on the door, shots were fired and "chaos was unleashed." S.K., E.L.'s wife, testified that she also heard Rideau arguing on the phone about pills, and about ten to twenty minutes later, she heard one set of heavy footsteps go upstairs and shots fired, and then saw Lively drive off alone in his silver car. S.K. added that she did not hear an argument or any fighting before she heard the gunfire.

Officer James Gillen, a City of Beaumont patrol officer, was in the area when he heard multiple shots fired, and he logged the plates of a silver car containing two people, which he observed leaving the residence where the murders occurred. Officer Gillen was wearing a body camera when he entered the residence and observed four male bodies in the upstairs apartment, and he explained that there was blood everywhere and two of the males were lifeless, one was involuntarily twitching, and the fourth male was moaning, crying for help, and "somewhat talking." Officer Gillen explained that when he asked the fourth male, who was identified as Rideau, what happened, Rideau responded, "Lively, he shot us." Officer

4

Gillen explained that when he was questioning a witness about what happened, Rideau again responded, "Lively." Officer Gillen also explained the witness reported that Lively's girlfriend was with him. Officer Gillen testified that Lively was identified as a suspect. Regarding the crime scene, Officer Gillen testified that he observed an open butterfly knife laying on the ground and a folded-up pocketknife not much larger than a lighter. The videos from Officer Gillen's patrol car camera and body camera were admitted into evidence.

Sergeant Daniel McCauley with the Beaumont Police Department testified that when he arrived at the scene his body camera was activated, and he observed a gruesome scene with four people on the ground and heard someone moaning and asking for help. Sergeant McCauley testified that he heard Rideau respond to Officer Gillen that Lively shot them and that Rideau reported that Lively was above him when he shot. Sergeant McCauley explained that he observed an open butterfly knife that appeared to have blood on it near the body closest to the door and another knife was close to Bobby Wyatt's body. Sergeant McCauley explained that a butterfly knife is a deadly weapon capable of causing serious bodily injury. Sergeant McCauley explained that the scene did not indicate who was threatening whom, or whether someone had used self-defense. Sergeant McCauley agreed that a person could use deadly force to prevent a robbery. Officer McCauley's body camera video was admitted into evidence.

5

Sergeant Yvette Borrero of the Beaumont Police Department testified that she interviewed E.L. and S.K., and she also interviewed B.W., who was with Lively on the day the murders occurred. B.W. testified that she was living with her friend, Lively in an upstairs room in the residence where the murders occurred. She explained that she knew the victims, and she said that they used drugs. According to B.W., the day before the murders occurred, she and Lively returned to their room after staying at a motel and discovered the door had been kicked open and the television was gone. B.W. testified that Lively was very upset and mad at Rideau because he thought Rideau had taken the television. B.W. explained that the night before the murders, Lively, Rideau and Sutton had argued over the telephone, and Lively was hurt and upset because he felt Rideau and Sutton had disrespected and bullied him.

B.W. added that the next morning, Lively told her "[d]on't stop or go to the house because he was gonna kill them." B.W. testified that they picked up their friend, D.J., and got a gun and when they went to the apartment in a silver car and discovered Stratton's air conditioner was missing, Lively asked D.J. for the gun, cocked it, and knocked on the victim's door. B.W. explained that when Rideau opened the door, "they had words but it wasn't, like, a heated argument but they had words, and then that's when I heard gunshots go off." B.W. testified that she "didn't think that he was actually gonna do it." B.W. also testified that she did not hear any

6

other victims arguing with Lively, any scuffling, or Lively crying for help, and when they left, she saw three dead and saw Rideau fighting for his life. B.W. explained that Lively had not been stabbed, and he did not claim he was attacked, threatened, or had acted in self-defense. B.W. admitted that she initially lied to the police about what occurred because she was scared after hearing the gun shots, seeing three dead and Rideau fighting for his life, and what Lively might do to her.

Dr. Selly Rae Strauch Rivers, a forensic pathologist, testified that she reviewed the victims' autopsies. Regarding Bellard, Dr. Rivers testified that he had two penetrating gunshot wounds to the head, and she explained that stippling was identified regarding one of the gunshot wounds, which indicated that the muzzle of the gun was from two inches to two feet away from Bellard when he was shot. Dr. Rivers explained that the second wound was a distant range wound, indicating that the two gunshots came at different distances. Dr. Rivers testified that Bellard's autopsy toxicology showed that he was positive for delta-9 THC, amphetamine, and methamphetamine, and she explained that based on the level of the drugs in his system she could not determine how the drugs might have affected his behavior.

Dr. Rivers testified that Rideau's autopsy showed that he had three perforating gunshot wounds. Dr. Rivers explained that Rideau had a gunshot wound that would not have been fatal to his head, near the front of his right ear, which she attributed to a gun fired at a distance of more than two feet. She added that Rideau had a fatal

7

distant wound to the left deltoid that perforated his lung. Dr. Rivers explained that the wound to Rideau's lung caused it to fill with blood, which resulted in Rideau being able to communicate only for a short while. Dr. Rivers testified that the third wound was a distant wound to Rideau's left thigh, which transected the femoral vein and would have caused blood to drain from his body very quicky. As to the toxicology tests, Dr. Rivers added that Rideau's results showed he was positive for THC, amphetamine, and methamphetamine, but she could not from the toxicology results testify about how the drug levels would have affected his behavior.

Addressing the conclusions she reached after she performed an autopsy on Wyatt's body, Dr. Rivers testified that he suffered gunshot wounds to the head, right upper interior torso, torso, and left upper extremity. Dr. Rivers explained that the wound to his head was a fatal distant wound to the right temporal scalp and the wound to his right upper interior torso was a nonlethal distant wound. Dr. Rivers further explained that the torso wound was a fatal, distant range wound, which passed through the colon. Lastly, Dr. Rivers explained that the upper extremity wound was a nonlethal distant range wound to Wyatt's left hand. As to Wyatt's toxicology results, Dr. Rivers testified Wyatt was positive for amphetamine and methamphetamine, and she said she could not express an opinion about how the drugs might have affected his behavior.

Turning to Sutton's autopsy, Dr. Rivers testified that it showed he suffered distant gunshot wounds to his head and neck. Dr. Rivers explained the wound to the neck was a near immediately fatal wound that had severed Sutton's spinal cord. Dr. Rivers testified that Sutton suffered a nonlethal distant gunshot wound to the right upper extremity. Sutton's autopsy toxicology showed he was positive for delta THC, amphetamine, and methamphetamine, and she had no opinion as to how the levels in his system would have affected his behavior.

On cross-examination, Dr. Rivers agreed that methamphetamine could cause aggressive behavior, hallucinations and irrational behaviors. She also clarified that her use of term "distant" meant at least two or more feet, and she testified that all the victims were facing the weapon when shot. However, on redirect Dr. Rivers testified that after reviewing the autopsy, she determined Rideau's head wound was back to front.

Lively testified in his defense. According to Lively, D.J. was his friend and in a sexual relationship with B.W., who had been his friend since they were in grade school. Lively testified that B.W. lived with him in his upstairs room and D.J. stayed with them. Lively explained that he got to know Rideau and Wyatt after they moved into another upstairs room as well as their friends, Sutton and Bellard. Lively testified that he had planned to move out because he did not like the company that the victims kept around, and when he and B.W. returned from the motel, he noticed

9

his door had been kicked in and his televisions were missing. Lively explained that he talked to Rideau on the phone about his missing items and Lively claimed to be upset and scared. Lively also explained that he told B.W. that he was going to get his "stuff" back.

Lively denied telling B.W. that he was going to kill the victims, and he explained that he wanted DJ to come so he could help him move the rest of his "stuff". Lively claimed that he was just going to ask if they had seen any of his "stuff", but when he got to his room he discovered his air conditioning units, car title, suitcase, and other items had been stolen. Lively testified that he asked D.J. for his firearm, which was for protection in case anything happened when he asked them about his "stuff". Lively explained that he was concerned about confronting the four victims because they had a history and he had already had words with Rideau.

Lively testified that before he knocked on the door, he had the gun in his pocket and a bullet in the chamber. Lively explained that he saw his television when he walked into the room to question them, and he described Rideau as aggressive, with an attitude, and he said Bellard closed the door, locked him in, and wielded a butterfly knife while walking towards him. Lively added that he was in "absolute fear[]" and concerned they were going to try to harm him, because all four of them were acting aggressive, closing in on him, and were "high." Lively testified that Wyatt told Rideau to grab the other blade and when he saw Bellard moving toward

10

him, he pulled the gun out of his pocket and "just shot." Lively explained that when he turned around and saw Rideau in his "direct space," he shot Rideau and then shot Wyatt and Sutton, who both continued to approach him. Lively agreed that Rideau, Wyatt, and Sutton were unarmed when he shot them. According to Lively, he fired his gun eleven times, with five of them at someone's head.

Lively testified he felt "pure terror[]" and that he thought his actions were reasonable because he was in fear that they were going to cause him serious bodily injury or death. According to Lively, he "just reacted." As Lively told it, he wanted to get away because he thought someone there might have had a gun. Yet Lively admitted that he never saw anyone else with a gun. Lively explained he did not immediately go to the police after the shooting because he feared he would be treated like a criminal. Lively admitted he intentionally and knowingly shot all four victims in the head, intending to kill them, but claimed he was justified in doing so.

In the charge, the trial court included instructions defining self-defense. The jury returned a verdict finding Lively guilty of capital murder of multiple persons as alleged in the fourth paragraph of the indictment, which alleged that Lively intentionally and knowingly caused the death of Wyatt and Sutton by shooting them with a firearm during the same criminal transaction.

11

ANALYSIS

In issue one, Lively complains the trial court erred by admitting Rideau's dying declaration into evidence. Lively filed a Motion to Exclude Dying Declaration, challenging the admission of Officer Gillen's testimony and the video recordings made from Officer Gillen's and Officer McCauley's body cameras. Lively argued that Rideau's statement did not meet the requirements of the dying declaration exception under Texas Rule of Evidence 804 because there was no evidence that Rideau knew his death was imminent or that he knew that he was at death's door.

We apply the abuse of discretion standard to determine whether the State met its burden to prove that a statement was admissible as a dying declaration. *See Montgomery v. State*, 810 S.W.2d 372, 390–93 (Tex. Crim. App. 1991) (op. on reh'g); *Scott v. State*, 894 S.W.2d 810, 811 (Tex. App.—Tyler 1994, pet. ref'd). Under the dying-declaration exception, a statement by a declarant, "while believing the declarant's death to be imminent, made about its cause or circumstances" is admissible as an exception to the hearsay rule. Tex. R. Evid. 804(b)(2). For the statement to be admissible as a dying declaration, it must meet three requirements: (1) the declarant must be unavailable; (2) the declarant, at the time he makes the statement, must believe his death is imminent; and (3) the statement must concern the cause or circumstances of the potential impending death. *Scott*, 894 S.W.2d at

12

811; *see* Tex. R. Evid. 804(b)(2). "Contemplation of death may be inferred from surrounding circumstances; it is not necessary that the [defendant] specifically express [his] awareness of impending death." *Thomas v. State*, 699 S.W.2d 845, 853 (Tex. Crim. App. 1985), *superseded on other grounds by, Najar v. State*, 618 S.W.3d 366, 371–72 (Tex. Crim. App. 2021); *Jones v. State*, No. 03-17-00328-CR, 2017 WL 3585205, at *3 (Tex. App.—Austin Aug. 15, 2017, pet. ref'd) (mem. op., not designated for publication).

Circumstances to consider in evaluating a potential dying declaration include: (1) the express language of the declarant; (2) the nature of the injury; (3) any medical opinion provided to the declarant; and (4) the conduct of the declarant. *Scott*, 894 S.W.2d at 812 (citing *Thomas*, 699 S.W.2d at 853); *see Taylor, v. State*, No. 12-15-00299-CR, 2017 WL 2962988, at *2 (Tex. App.—Tyler July 12, 2017, pet. ref'd) (mem. op., not designated for publication). Rule 804(b)(2) requires sufficient evidence, direct or circumstantial, that demonstrates that the declarant must have realized that he was at death's door when he spoke. *Gardner v. State*, 306 S.W.3d 274, 290 (Tex. Crim. App. 2009).

Rideau's sense of impending death may be established by his express words, his conduct, the severity of his wounds, the opinions of others stated to him, or any other relevant circumstances. *See id.* Moreover, the fact that Rideau's statements were made in response to a question does not render it inadmissible. *See Scott*, 894

13

S.W.2d at 812. The question, "Who did this to you?" is not an impermissible leading question because it does not suggest which answer is desired. *See Taylor*, 2017 WL 2962988, at *3 (citations omitted).

During the pretrial hearing, the trial court reviewed the video recordings from Officer Gillen's and Sergeant McCauley's body cameras and heard arguments about the admissibility of Rideau's dying declaration. The videos show that when the officers arrived, they found Rideau lying in the room with three other men who were nonresponsive. Rideau was moaning and crying out for help. When Officer Gillen asked Rideau what happened, Rideau responded, "Lively, he shot us. I need help." When Officer Gillen questioned another person about the identity of the person who had just left the house, Rideau is heard in the background stating, "Lively." When Officer Gillen questioned Rideau about who shot him, Rideau again stated, "Lively." Sergeant McCauley's video shows that when McCauley asked Rideau where he had been shot, Rideau responded that he had been shot in his arm, side, and chin. Sergeant McCauley's video also captured Rideau's statements that Lively shot him.

The videos show that Rideau was aware of the nature of his injuries and that he needed help. *See King v. State*, No. 06-21-00149-CR, 2022 WL 2163020, at *2 (Tex. App.—Texarkana June 16, 2022, pet. ref'd) (mem. op., not designated for publication). While Rideau did not make any specific statements expressing that his death was imminent, it was not unreasonable for the trial court to infer from the

14

entire record that Rideau could have reasonably believed that under the circumstances his death was imminent given the severity of his injuries and the fact that he is heard in the video calling out for help. *See Jones*, 2017 WL 3585205, at *4; *Scott*, 894 S.W.2d at 811–12. The direct and circumstantial evidence allowed the trial court to infer that Rideau realized his death was imminent when he spoke to Officer Gillen and Sergeant McCauley. *See Gardner*, 306 S.W.3d at 290–91; *King*, 2022 WL 2163020, at *2; *Scott*, 894 S.W.2d at 812.

After reviewing the videos, the trial court stated on the record that based on the totality of the circumstances, including that Rideau was found lying near three other people who appeared nonresponsive, knew he had been shot multiple times, and was asking for help and unable to move, Rideau's statement qualified as a dying declaration. Accordingly, we conclude the trial court did not abuse its discretion in admitting Rideau's statements as dying declarations, so we overrule issue one.

In issue two, Lively contends the evidence was sufficient to find him not guilty based on self-defense. We review the sufficiency of the evidence supporting a jury's rejection of a self-defense claim under the *Jackson v. Virginia* standard. *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Smith v. State*, 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). In evaluating whether the evidence is sufficient, we review all the evidence in the light most favorable to the prosecution to determine

15

whether any rational trier of fact would have found the essential element of the offense beyond a reasonable doubt and would have found against the defendant on the self-defense issue beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 609 (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). We give deference to the jury to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We treat direct and circumstantial evidence equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is entitled to judge the credibility of the witnesses and can choose to believe all, some, or none of the witnesses' testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A person commits the offense of capital murder of multiple persons if he commits murder as defined by section 19.02(b)(1) of the Texas Penal Code and murders more than one person during the same criminal transaction. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A). A person commits murder either by (1) "intentionally or knowingly" causing a death, or (2) intending to cause "serious bodily injury" through an act "clearly dangerous to human life that causes the death of an individual[.]" *Id.* § 19.02(b)(1), (2). A person acts "intentionally" with respect

16

to the nature or a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *See id.* § 6.03(a). A person acts "knowingly" with respect to the nature of his conduct when he is aware of the nature of his conduct, and a person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

Section 9.31 of the Penal Code provides that a person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017); *see* Tex. Penal Code Ann. § 9.31(a). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see* Tex. Penal Code Ann. § 9.32(a). The Penal Code defines the term "reasonable belief" to mean a "belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(42). A person's belief that deadly force was immediately necessary is presumed to be reasonable if the actor did not provoke the person against whom the force was used, was not otherwise engaged in a criminal activity other than a Class C misdemeanor, and knew or had

17

reason to believe that the person against whom the force was used: (1) unlawfully and with force entered or attempted to enter the actor's habitation, vehicle, or place of business; (2) unlawfully and with force removed or attempted to remove the actor from his habitation, vehicle, or place of business; or (3) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *Id.* § 9.32(b)(1).

A defendant bears the burden to produce evidence supporting a claim of self-defense, and if met, the burden shifts to the State to disprove the defense. *See Braughton*, 569 S.W.3d at 608. The defendant's burden requires the production of some evidence to support a claim of self-defense, and the State bears the burden of persuasion to disprove the defense. *Id.* at 608–09 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). A jury's guilty verdict is an implied rejection of a defendant's self-defense claim. *Id.* at 609.

The jury considered Lively's testimony that he had the gun in his pocket and a bullet in the chamber before he knocked on the door since he already had words with Rideau and was concerned about confronting the victims. Lively admitted he intentionally and knowingly shot all four victims in the head with the intent to kill them, but claimed he was justified in doing so. Lively testified that he was in absolute fear because Bellard wielded a butterfly knife at him, Wyatt told Rideau to grab the other blade, and all four victims aggressively closed in on him, but he also testified

18

that Rideau, Wyatt, and Sutton were unarmed when he shot them. The jury heard Lively testify that even though he never saw any of the victims with a gun, he thought his actions were reasonable because they might have had a gun and he was in fear they were going to cause him serious bodily injury or death.

The jury's decision to reject Lively's claim of self-defense could have hinged on the credibility of the witnesses and the weight the jury decided to give to their testimony. *See Smith*, 355 S.W.3d at 146 (citing *Chambers*, 805 S.W.2d at 461). The testimony of a defendant does not conclusively prove a self-defense claim. *Id*. Here, the jury chose not to believe Lively's testimony that he acted in self-defense when he shot the four victims a total of eleven times, with each of the victims being shot at least once in the head, and one victim with two shots to the head. Given the evidence supporting the finding that Lively committed murder, Lively's testimony that he acted in self-defense does not overcome the evidence found by the jury in support of its verdict. *See id*. The other evidence, including the State's witnesses, the physical evidence, and Lively's flight from the scene, all undermine Lively's claim of self-defense.

B.W. testified that the night before the murders, Lively was mad at Rideau and had argued with Rideau and Sutton over the telephone. B.W. explained that on the morning before the murders occurred, Lively told her "[d]on't stop or go to the house because he was gonna kill them." B.W. testified that before Lively shot the

19

victims, she did not hear any arguing, scuffling, or Lively crying for help. B.W. also testified that Lively never claimed he acted in self-defense. E.L. testified that the day before the shootings, Lively was very mad and upset with everyone upstairs, and the morning of the shootings he heard Rideau arguing on the phone with a person who was talking about coming to shoot people. E.L. and S.K. also testified that they did not hear any fighting before the shots were fired, and E.L. explained that shots were fired within a "split second" of hearing someone knock on the door. E.L., S.K., and B.W. all testified that Lively left the scene. Lively's flight from the scene is circumstantial evidence of his guilt. *See Smith*, 355 S.W.3d at 147; *Miller v. State*, 177 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Officer Gillen and Sergeant McCauley testified that Rideau stated that Lively shot them, and the jury viewed the officers' videos showing the scene and Rideau's dying declaration. Officer Gillen and Sergeant McCauley testified that they observed an open butterfly knife and a folded-up pocketknife at the scene, and even though McCauley explained that a butterfly knife is a deadly weapon capable of causing serious bodily injury, he also explained the scene did not reflect whether someone had used self-defense. Additionally, the evidence does not support that any of the circumstances listed in section 9.32(b) of the Penal Code existed in this case, so there is no presumption that Lively's belief that deadly force was immediately necessary was reasonable. *See* Tex. Penal Code Ann. § 9.32(b).

20

We conclude that the jury rationally could have found that each element of the charged offense was proven beyond a reasonable doubt, and rationally could have rejected Lively's claim of self-defense. *See Jackson*, 443 U.S. at 319; *Braughton*, 569 S.W.3d at 608–09. Accordingly, we hold that the evidence is sufficient to support Lively's conviction. We overrule issue two.

In issue three, Lively argues the trial court erred by not including instructions or definitions concerning self-defense against multiple assailants in the charge. In issue four, Lively argues the trial court erred by not including presumptive language of self-defense in the charge. The State argues Lively forfeited any right to the instructions because he failed to request them.

In reviewing alleged charge error, we determine whether error existed in the charge, and if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *see Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015). Article 36.14 of the Texas Code of Criminal Procedure requires a defendant to object to claimed errors in the charge before he may complain about the error on appeal. Tex. Code Crim. Proc. Ann. art 36.14. Generally, there is no error unless the defendant objects to the claimed omission in the charge. *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998). Article 36.14 requires the trial judge to deliver to the jury "a written charge distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. Ann. art 36.14.

21

The trial judge is responsible for the accuracy of the charge and accompanying instructions and must ensure all applicable law is incorporated into the charge. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

The trial judge must give a requested instruction on any defensive issue raised by the evidence. *Dugar v. State*, 464 S.W.3d 811, 816 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). A defensive issue is raised by the evidence if there is some evidence on each element of a defense that, if believed by the jury, would support a rational inference that the element is true. *Id.* When there is evidence, viewed from the standpoint of the jury, that the defendant was in danger of an unlawful attack at the hands of more than one assailant, the trial court should instruct the jury that the defendant had a right to defend against the multiple assailants. *Jordan v. State*, 593 S.W.3d 340, 345 (Tex. Crim. App. 2020) (citing *Black v. State*, 145 S.W. 944, 947 (Tex. Crim. App. 1912)); *Dugar*, 464 S.W.3d. at 817. However, trial courts are not required to *sua sponte* instruct juries on defensive issues. For example, the Texas Court of Criminal Appeals recognized that decisions about "which defensive issues to request are strategic decisions generally left to the lawyer and client." *Posey*, 966 S.W.2d 57 at 60, 62; *Eyman v. State*, No. 13-15-00589-CR, 2017 WL 3634058, at *5 (Tex. App.—Corpus Christ-Edinburg Aug. 24, 2017, no pet.) (mem. op., not designated for publication). For that reason, the rules of error preservation require defendants, as to a particular self-defense issue, to request the instruction and object

22

to the omission of the instruction or forfeit the issue. *See Allen v. State*, No. 03-15-00420-CR, 2017 WL 1832456, at *2–3 (Tex. App.—Austin May 2, 2017, pet. ref'd) (mem. op, not designated for publication).

Based on the record, Lively did not preserve his complaint about the omission of an instruction on his right to defend against multiple assailants during the charge conference. Instead, the record shows that during the charge conference, the following exchange occurred:

> THE COURT: . . . [E]veryone's been given a copy of the Court's proposed charge[,] [a]nd I would ask at this time, are there any objection or corrections or additions[?]
>
> [THE STATE]: Not from the State, Your Honor.
>
> . . .
>
> [THE DEFENSE]: . . . [T]he Court ruled on this, I think, off the record in a charge conference we had - -
>
> THE COURT: Mm-mm.
>
> [THE DEFENSE]: - - but it's our belief that, at least in part - - it's not a perfect language for the crime, but at least in part what was going on here was essentially a theft or a burglary from my client's room of items that belonged to him - - rightfully belonged to him. . . . Those items were then transported across the hall to Mr. Rideau's room and essentially stolen. It was our position during trial, and we still take that position, that this is - - again, it's not a perfect version of it but at least meets the elements of robbery; once someone takes an item that is not theirs with the intent of depriving the owner of that item, and then uses force to convert that or maintain that property. Here, it is our position that the four people involved in this altercation were attempting to deprive Mr. [Lively] of these items and at the very least using force to protect those items. So, it was our position - - I understand the Court's

23

ruled on this, but it is our position this is essentially a robbery. And the example I used in trial with a number of witnesses is if I . . . took stuff from Hobby Lobby . . ., got to the parking lot and then used a can of mace on the person that was trying to prevent the theft, it converts from a theft to a robbery. So, using force to maintain that unlawful - - the unlawful proceeds. So, we're looking for an instruction under 9[.]32(b)(2). I understand the Court's denied it, but I'm putting my reasoning for asking for it on the record.

THE COURT:  Sure.

[THE DEFENSE]: And I understand the State is opposed, and that's fine. . . .

THE COURT:  Right. And just for sake of argument, the  - - I don't believe - - I mean, my ruling was based on the fact that I don't believe it ended up being a robbery. . . .

[THE DEFENSE]: It's not a perfect analogy. I was using - - I guess my argument would be though because my client had a right to be in the property, in the second floor of 4142 Highland, that's different than going to someone else's house - -

THE COURT:  Right.

[THE DEFENSE]: - - - to have that conversation.

THE COURT:  But it was in the other room.

[THE DEFENSE]: No question.

THE COURT:  Okay.

[THE DEFENSE]: Either way. I was asking for that instruction - -

THE COURT:  That was denied.

[THE DEFENSE]: -- and the accompanying language to that.

THE COURT:  Right.

24

[THE DEFENSE]: The other thing, Judge, we - - based on some experience that we've had in other courts and based on the complications and based on this Court's ruling, we would also ask for the presumption language. We ask kinda softy because I don't really like the presumption language. I like the rest of the language on the PJC.

THE COURT: On self-defense?

[THE DEFENSE]: Self-defense. Sorry. As you know self-defense goes on to say there's a presumption of reasonableness if you are trying to prevent a robbery, a murder - - you know, it makes a list. The only one that we thought was applicable here would have been robbery. The Court's obviously said that's not supported by the evidence, and that's fine. But that is an additional reason that we are not asking for the presumption language.

THE COURT: Thank you.

[THE DEFENSE]: And again, that's a strategic decision. It's not something we came by accidentally or an oversight.

Lively has not identified in the record where he asked the trial court to instruct the jury on a claim of self-defense against multiple assailants, and we find no such request in the record. The State argues Lively forfeited any right to the instruction, and the trial court was not required to *sua sponte* issue the unrequested instruction. We agree.

We hold Lively failed to preserve his third issue for appeal by failing to request the trial court instruct the jury on his claim of self-defense against multiple assailants. *See Posey*, 966 S.W.2d 57 at 60; *Allen*, 2017 WL 1832456, at *2–3. We overrule issue three.

25

While Lively also argues the trial court erred by not including presumptive language of self-defense in the jury charge, the record shows that defense counsel informed the trial court that it was a strategic decision to not ask for the presumption language. *See* Tex. Penal Code Ann. § 9.32(b) (stating that a person's belief that deadly force was immediately necessary is presumed to be reasonable if the person, among other things, knew or had reason to believe that the person against whom the force was used was committing or attempting to commit robbery). Defense counsel stated that it was "fine" that the trial court found that the evidence did not support his theory that a robbery occurred and admitted that his theory was not a "perfect analogy." From the exchange, it appears that defense counsel made a strategic decision not to ask for the presumption language that he complains about on appeal.

We conclude Lively forfeited his right to complain on appeal about the failure of the trial court to include the presumptive language of self-defense instruction in the charge. *See Posey*, 966 S.W.2d at 60; *Eyman*, 2017 WL 3634058, at *5. We overrule issue four. Having overruled Lively's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on March 28, 2023
Opinion Delivered July 12, 2023

Before Golemon, C.J., Horton and Johnson, JJ.

26