**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00337-CR**
_____

**KYLAN DEION BAZILE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F20-33887**

**MEMORANDUM OPINION**

Appellant Kylan Deion Bazile ("Bazile") appeals his conviction for murder,
a first-degree felony. *See* Tex. Penal Code Ann. § 19.02(b)(1), (c). In three issues on
appeal, Bazile complains about jury charge error, the sufficiency of the evidence,
and ineffective assistance of counsel. For the reasons discussed below, we affirm the
trial court's judgment.

1

# BACKGROUND

A grand jury indicted Bazile for murder, alleging he "intentionally and knowingly cause[d] the death of an individual, namely: DESHANDRIC JISHAUN CLAYTON ("Clayton" or "Complainant"), by shooting Complainant with a deadly weapon, to-wit: a firearm[.]" *See id.* The case proceeded to a jury trial, where the State offered testimony from thirteen witnesses about the murder and subsequent investigation and presented ballistics and firearms evidence, photographs, and video recordings.

Dr. Tommy J. Brown ("Brown"), a retired forensic pathologist, testified he performed an autopsy on Clayton, who had a gunshot wound to the right of his right nipple, and Brown stated that Clayton was shot at a distance. Brown explained Clayton's cause of death was a perforating gunshot wound to the chest, and the manner of death was homicide. Brown testified that Clayton's toxicology shows he had methamphetamine in his system when he died and that sometimes, methamphetamine can cause aggressive behavior, irrational reactions, and hallucinations. Brown also testified that there were shell casings found around Clayton's body.

Tonya Toson ("Toson"), Clayton's mother, testified she told police she believed Kaleb Angelle and Jarrell Joseph were suspected to have been involved in Clayton's murder. Toson explained that there was a crowd when she was at the scene

2

of the murder at Avery Trace, and "somebody" said they saw Jarrell Joseph and Kaleb Angelle shoot Clayton. Toson further explained that she heard two cars were involved in the shooting and that Jospeh and Angelle were in the "first car[,]" and Bazile was the driver of the second car, which also contained "[s]omeone by the name of Kam[,]" which was short for Kamron Fennell. Toson testified that shots came from both cars, and she agreed that Bazile did not shoot Clayton, who also went by the name "Deejayye." Toson explained Clayton identified himself as Deejayye on his Facebook page. Toson testified that she never knew Clayton to have a gun and that he was visiting his cousin, Ecstasy Toson ("Ecstasy"), at Avery Trace Apartments when Clayton was murdered.

Ecstasy testified that on the day of the murder, Clayton and Tyron Banks were at her apartment, when Keith Page came over. Soon after Clayton, Banks, and Page left her apartment she heard gunshots and learned Clayton had been shot. Ecstasy testified that based on her knowledge Clayton did not know Bazile. Ecstasy also testified that she had a gun in her apartment, which remained there during the murder, and she knew Page had a gun. Ecstasy explained that after the shooting, she saw shell casings in the area where Clayton was found.

Dillan Halliburton ("Halliburton"), a former police officer with the City of Port Arthur Police Department, testified that when he responded to an emergency call regarding a shooting at Avery Trace, he observed a large group of people

3

surrounding the victim, who was laying on the ground covered in blood. Halliburton explained that although there was a crowd of thirty to forty people, everyone came outside after they heard gunshots, and that from his experience, it was common not to have eyewitnesses to shootings at Avery Trace. Halliburton identified Clayton as the victim and determined he had a gunshot wound on the right side of his chest. Halliburton testified he saw five spent shell casings near Clayton's body, which indicates someone was shooting from that area, and he found spent shell casings on a nearby street. Halliburton explained that Tyron Banks reported that he was inside Toson's apartment when the shooting occurred and that an empty handgun magazine was found in Banks's vehicle.

Halliburton testified that none of the evidence showed Bazile shot Clayton, and he explained that Jacory Reynolds, Ardajour Jimmerson, and Kamron Fennell were also indicted for Clayton's murder. Halliburton explained that during his investigation, he obtained video camera footage from residents in the area, but none of the footage included the suspect's vehicle. Halliburton also explained that after he left Avery Trace, he went to Prince Hall Apartments, where he located the suspect's vehicle, a 2018 Kia passenger car that appeared to have a bullet hole on the passenger side of the car.

Shelby Harper ("Harper"), a sergeant with the Port Arthur Police Department, testified that she was assigned to the crime response team when she responded to the

4

shooting. Harper explained she obtained security video footage from a restaurant located across the street from Avery Trace, and the video showed a maroon car that passed by, and you could hear shots fired and then see the victim fall. Harper also explained that she recognized the maroon car from previous dealings based on it having certain chrome door handles, chrome along the windows, a piece of duct tape on the back trunk, and a dent on the driver's side door. Harper testified that Bazile owns the Kia car, and she had seen him driving it before the shooting. Harper also testified that the duct tape on the trunk of the car was clearly visible in the security video because it reflected with the sun.

Harper explained they located the car at Prince Hall, where they knew Bazile lived, and they found another individual driving the car. Harper testified she obtained video footage from Prince Hall, showing that several people jumped out of the car when it returned, including Reynolds, but it was hard to tell if Bazile was driving. Harper further testified she had no evidence showing Bazile shot Clayton. Harper explained she obtained a search warrant for Reynolds's cell phone, but due to a problem, the data from his cell phone dump was never reviewed.

Leesa Bigelow ("Bigelow"), a forensic specialist/ID technician with the Port Arthur Police Department, testified that she processed the Kia car related to the homicide. Shortly after the incident, Bigelow collected DNA swabs from the car's interior, specifically the driver's side pull handle and armrest handle, steering wheel,

5

and passenger's side pull handle and armrest, to determine who had been in the car, who was driving, and who was shooting. Bigelow explained that her job only involved collecting the DNA swabs and logging them into evidence. Bigelow testified she also collected and viewed video footage from the Mexican restaurant and the Valero gas station across the street from Avery Trace. Bigelow testified that State's Exhibit 53 is the video from the Mexican restaurant, and that the time stamp for State's Exhibit 54, the video from the Valero gas station, is an hour behind actual time.

Tomas Barboza, a detective with the City of Port Arthur Police Department, testified that he put together the video footage from the Mexican restaurant and the Valero gas station contained in State's Exhibits 53 and 54. Barboza testified he prepared State's Exhibit 56, which is a summary compilation of the videos contained in Exhibits 53 and 54, to help the jury understand the evidence. The State published a redacted version of State's Exhibit 56 to the jury and named it State's Exhibit 56A. Barboza explained that he was familiar with Bazile and his car, and the video shows Bazile exiting a maroon Kia at the Valero gas station at 3:24 p.m. the day of the murder. Barboza also explained he modified the video by zooming in and using an error and circle to point out the duct tape on the back of Bazile's car. Barboza testified the video shows Bazile's car backing up at 3:33 p.m. and traveling eastbound inside Avery Trace, and that the front right passenger seat's window was

down. Barboza further testified the video shows Clayton walking to the breezeway, a white car passing by and then the maroon Kia passenger car passing by, and Clayton falling to the ground and clutching his chest after the maroon car passed. Barboza explained the video did not show Clayton had a gun in his hand or that Bazile was the shooter. Barboza testified that based on the evidence he reviewed, no evidence supported a self-defense claim.

Adam Cousins ("Cousins"), a detective with the City of Port Arthur Police Department and a certified firearm instructor, testified he responded to the shooting at Avery Trace. Cousins testified that a firearm is a deadly weapon.

Cousins explained he found spent shell casings where Clayton's body was found and in the roadway. Cousins questioned Tyron Banks, who testified he was upstairs showering when Clayton was shot. Cousins testified that after Sergeant Harper identified Bazile's car as a suspect vehicle in the video from the Mexican restaurant, a detective located his car at Prince Hall. There, officers found Lionel Junior inside Bazile's car, which had a fresh bullet hole in the passenger's front quarter panel. Cousins testified that Lionel Junior reported he moved the vehicle for Bazile, and the police determined he was not involved in the shooting although his gun residue test showed he tested positive for shooting a gun.

Cousins explained he viewed the compilation video from the Mexican restaurant and Valero gas station, which shows Bazile in his car leaving the gas

station, entering Avery Trace with the passenger side window rolled down, Clayton standing in the breezeway with nothing in his hand, and Clayton's reaction when he was shot. Cousins testified that no evidence showed Bazile shot Clayton. Cousins also testified that Reynolds, Jimmerson, and Fennell were also indicted for Clayton's murder, and they were all inside Bazile's car with Bazile when Clayton was shot. He explained that one of them was the shooter but he did not know which one.

Marie Kirkland ("Kirkland"), a crime scene investigator with the Port Arthur Police Department, testified that she and another forensic specialist processed Bazile's car for fingerprints. Kirkland testified the results showed Bazile's fingerprints were found on the passenger's side, driver's side, the hood on the driver's side, and passenger's side window. Kirkland explained Fennell's fingerprints were on the front passenger side's weather stripping and window, and Jimmerson's fingerprints were on the driver's side rear door above the door handle. Kirkland also explained that she collected the fired shell casings and bullet fragments from the scene. Kirkland testified she had no evidence showing Bazile was the shooter.

Robert Baldwin ("Baldwin"), a private consultant in firearms and toolmarks identification, testified that in this case, he examined the fired exhibits consisting of fired cartridge cases, bullet fragments, and an intact projectile. Baldwin explained the evidence included 9-millimeter Luger cartridge cases and .25 auto cartridge

8

cases. After comparing those cartridge cases, he determined the four fired 9-millimeter Luger cartridge cases were fired from the same firearm, and the five .25 auto cartridge cases were all fired from the same firearm. Baldwin also explained that the intact fired bullet could have been fired from the same firearm as the four fired 9-millimeter Luger cartridge cases. Baldwin testified that the bullet jacket fragment recovered was not fired from the same firearm as the intact bullet, and some of the bullet jacket fragments had a different type of rifling, which shows it was fired from a different firearm.

Baldwin further testified there was one characteristic gunshot primer residue particle confirmed on the gunshot primer residue kits from Junior and Banks. He explained that Clayton's kit was returned without analysis because the Texas Department of Public Safety's policy was not to analyze samples from shooting victims since most homicide victims have gunshot residue on their hands. Baldwin explained that he disagreed with that policy since Clayton was shot at a distance, one would not expect for the gunshot residue from the shooter's gun to be on Clayton.

Torry Washington ("Washington"), who testified about his prior convictions and pending charges, claimed the district attorney's office had not offered him leniency in exchange for his testimony. Washington testified he was with his friend, Keith Page, when he saw Deejayye standing outside close to the breezeway and Bazile, whose street name was KB, driving his car, a "[b]urgundy Kia," and Bazile

"come around . . . the parking lot basically," and then the next thing, "you know, the car leaves and I hear gunshots." Washington testified that Deejayye had a "gun on him" and fell, and then Page "had a 20 something caliber gun and he start shooting." Washington testified he did not see Deejayye fire a gun, and he told the police Deejayye raised his gun and that Banks took the gun off him. Washington explained that he saw Bazile, Fennell, Reynolds, and Jimmerson in Bazile's car and "they were shooting." Washington testified that Bazile was driving, Fennell was in the front passenger seat, and Reynolds and Jimmerson were in the back seat. Washington also explained that after the shots from the car, Page fired five or six shots from the breezeway.

Washington testified that Bazile later told him that he planned to sell drugs in the area and Fennell wanted to drive through the apartment complex where they saw the "opposition," and when they got around the gate area Fennell started shooting. Washington testified that Bazile told him they left the area and went to Prince Hall and stashed the guns and cleaned off. Washington testified that Bazile also told him he "wasn't going down by hisself[]" for a murder he did not commit. Washington explained he did not come forward in 2019 when Clayton was shot because he was scared, and in 2021, he talked to the Port Arthur Police Department about Clayton's shooting and other shootings when he was arrested on three cases. Washington also

10

explained that based on what he saw and what Bazile told him, he believed Fennell was the shooter.

The jury found Bazile guilty of murder as charged in the indictment, and after considering more evidence during the punishment phase, the jury assessed his punishment at thirty years of confinement. During sentencing, the trial court made an affirmative finding on the deadly weapon allegation.

## ANALYSIS

### Sufficiency of the Evidence

In issue two, Bazile complains the evidence was legally insufficient to support his conviction for murder. We address this issue first, since if it is meritorious, we would render a judgment of acquittal rather than reverse and remand. *See Franco v. State*, No. 09-22-00027-CR, 2023 WL 8609289, at *6 (Tex. App.—Beaumont Dec. 13, 2023, pet. ref'd) (mem. op., not designated for pub.); *see also* Tex. R. App. P. 47.1.

We review complaints of legal insufficiency under the standard in *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). *See Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). Under *Jackson*, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original) (citation omitted); *see Brooks v. State*, 323

S.W.3d 893, 912 (Tex. Crim. App. 2010). We defer to the jury's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the above evidence. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citation omitted). We presume the jury resolved any conflicts in testimony in favor of the verdict. *See Brooks*, 323 S.W.3d at 899 n.13. We treat direct and circumstantial evidence equally and "'consider the combined and cumulative force of the evidence'" viewed in the light most favorable to the jury's verdict. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citation omitted).

A person commits the offense of murder, if the person "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). The indictment alleged Bazile intentionally and knowingly caused the death of Clayton by shooting Clayton with a deadly weapon, a firearm. "A person acts intentionally . . . with respect to the nature or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A person acts "knowingly" with respect to the nature of his conduct when he is aware of the nature of his conduct, and a person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

A firearm is statutorily defined as a deadly weapon. *Id.* § 1.07(17)(A). A jury may infer the intent to kill from the use of a deadly weapon unless it would not be

reasonable to infer that death or serious bodily injury could result from using the weapon. *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012); *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Jackson v. State*, No. 09-16-00253-CR, 2017 WL 3975689, at *3 (Tex. App.—Beaumont Aug. 30, 2017, no pet.) (mem. op., not designated for publication). The most obvious cases and the easiest ones in which to prove intent to kill, are those cases in which a firearm was used and fired at a person. *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). The jury may consider the events before, during, and after the commission of the offense. *Jackson*, 2017 WL 3975689, at *3 (citation omitted).

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01(a). "Each party to an offense may be charged with the commission of the offense." *Id.* § 7.01(b). "A person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id.* § 7.02(a)(2). "Mere presence alone will not constitute one as a party to the offense." *Cardenas v. State*, No. 05-22-00087-CR, 2023 WL 3613725, at *2 (Tex. App.—Dallas May 24, 2023, no pet.) (mem. op., not designated for publication). Circumstantial evidence is considered as probative as direct

13

evidence, and it is sufficient, standing alone, to establish a defendant's guilt. *Hooper*, 214 S.W.3d at 13 (citation omitted). Circumstantial evidence alone may also be sufficient to establish that a defendant was a party of the offense. *Id.*; *Wheaton v. State*, No. 09-16-00160-CR, 2017 WL 929441, at *6 (Tex. App.—Beaumont Mar. 8, 2017, no pet.) (mem. op., not designated for publication) (stating party participation may be shown by events before, during, or after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act) (quoting *Salinas v. State*, 163 S.W.3d 734, 739–40 (Tex. Crim. App. 2005)).

After viewing the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Clayton's death was caused by the intentional use of a deadly weapon. *See* Tex. Penal Code Ann. § 19.02(b)(1) (murder); *Cavazos*, 382 S.W.3d at 384 (use of deadly weapon); *Cardenas*, 2023 WL 3613725, at *4. The State offered evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, that Bazile acted "with intent to promote or assist" in committing Clayton's murder and aided others in committing the offense. *See* Tex. Penal Code Ann. §§ 7.01(a) (parties to offenses); 7.02(a)(2) (criminal responsibility for conduct of another); *Cardenas*, 2023 WL 3613725, at *4;

14

*Wheaton*, 2017 WL 929441, at \*6–8. Accordingly, we conclude the evidence is sufficient to support the jury's verdict. We overrule issue two.

## Jury Charge Error

In issue one, Bazile argues there was sufficient evidence that entitled him to a jury instruction on self-defense and that the trial court needed to include the instruction. The State argues Bazile failed to preserve this issue for appellate review. We agree that Bazile failed to preserve this issue for appellate review.

In reviewing alleged charge error, we determine whether error existed in the charge, and if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005); *see Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015). Article 36.14 of the Texas Code of Criminal Procedure requires defendants to object to claimed errors in the jury charge before he may be heard to complain on appeal. Tex. Code Crim. Proc. Ann. art 36.14. Generally, there is no error unless the defendant objects to the claimed omission in the jury charge. *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998). Article 36.14 requires the trial judge to deliver to the jury "a written charge distinctly setting forth the applicable law to the case[.]" Tex. Code Crim. Proc. Ann. art 36.14. The trial judge is responsible for the accuracy of the jury charge and the instructions and must ensure all applicable law is incorporated into the jury charge. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

15

The trial judge must give a requested instruction on any defensive issue raised by the evidence. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Dugar v. State*, 464 S.W.3d 811, 816 (Tex. App.—Houston [14th Dist. 2015, pet. ref'd). A defensive issue is raised by the evidence if there is some evidence on each element of a defense that, if believed by the jury, would support a rational inference that the element is true. *Krajcovic*, 393 S.W.3d at 286; *Dugar*, 464 S.W.3d at 816. That said, the trial court need not *sua sponte* instruct a jury on defensive issues, as the Texas Court of Criminal Appeals has recognized that "which defensive issues to request are strategic decisions generally left to the lawyer and client." *Posey*, 966 S.W.2d at 62–63; *Stratton v. State*, No. 09-22-00140-CR, 2023 WL 4484246, at *9 (Tex. App.—Beaumont July 12, 2023, pet. ref'd) (mem. op., not designated for publication) (citations omitted). Additionally, a defendant who denies committing the offense, is not entitled to a self-defense instruction because he contends "he has engaged in no conduct which needs justifying." *Gilmore v. State*, 44 S.W.3d 92, 97 (Tex. App.—Beaumont 2001, pet. ref'd).

To preserve a complaint for appellate review that the trial court did not instruct the jury on a particular self-defense issue, the defendant must request the instruction and object to the omission of the instruction, or the issue is forfeited. *See Stratton*, 2023 WL 4484246, at *8–9 (stating rules of error preservation require defendants, as to a particular self-defense issue, to request the instruction and object to its

16

omission); *Allen v. State*, No. 03-15-00420-CR, 2017 WL 1832456, at *2–3 (Tex. App.—Austin May 2, 2017, pet. ref'd) (mem. op., not designated for publication) (same).

Bazile has not pointed to any place in the record showing he requested an instruction for self-defense, and we have not found any such request in the record. Since there is nothing in the record showing that Bazile requested a self-defense instruction, we hold that the trial court did not err in failing to instruct the jury on that issue and that Bazile has forfeited that issue on appeal. *See Posey*, 966 S.W.2d 57 at 62–63; *Stratton*, 2023 WL 4484246, at *8–9; *Allen*, 2017 WL 1832456, at *2–3. We overrule issue one.

**Ineffective Assistance of Counsel**

In issue three, Bazile argues his trial counsel was ineffective because he failed to properly request a self-defense instruction.

"Evaluating claims of ineffective assistance of counsel under the Sixth Amendment involves a two-pronged test: (1) whether counsel was deficient, and (2) whether the defendant suffered prejudice as a result of counsel's error." *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish counsel's deficient performance, an appellant must show by a preponderance of evidence that counsel's actions fell below an objective standard of reasonableness. *Id.*; *see also Strickland*, 466 U.S. at 687–88.

17

"Under *Strickland,* the defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Our review of counsel's performance is highly deferential, and we presume they provided reasonable assistance. *See id.* at 833. We afford counsel a strong presumption that their conduct falls within a wide range of reasonable professional assistance, and a defendant must overcome this presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 781; *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) (citation omitted). To overcome this presumption, "[a]ny allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the ineffectiveness." *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998); *see also Johnson*, 624 S.W.3d at 586 (citation omitted); *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

"Under most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004) (citation omitted); *see also Hart*, 667 S.W.3d at 782.

18

Ordinarily, trial counsel should be given an opportunity to explain their conduct before being considered ineffective. *Hart*, 667 S.W.3d at 782. Without such an opportunity, and in the face of an undeveloped record on direct appeal, we "'commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013)). We will consider counsel's actions deficient only if we find no reasonable trial strategy could justify counsel's acts or omissions, regardless of their subjective reasoning. *See id.* (quoting *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)).

The record does not indicate that Bazile filed a motion for new trial alleging ineffective assistance, and the record is undeveloped regarding counsel's trial strategy and decisions. *See Graves v. State*, 310 S.W.3d 924, 929 (Tex. App.—Beaumont 2010, pet. ref'd). With no opportunity for trial counsel to explain his actions, we assume he had a strategic reason for his decisions. *See Hart*, 667 S.W.3d at 782. In addition, trial counsel's ineffectiveness is not apparent from the record. *See Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003). Bazile cannot defeat the strong presumption that counsel's decisions during the trial fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 782; *see also Beatty v. State*, No. AP-75010, 2009 WL

619191, at *10 (Tex. Crim. App. Mar. 11, 2009) (per curiam) (not designated for publication) (overruling complaint that counsel was ineffective for failing to request a charge on self-defense when record on direct appeal did not overcome the strong presumption that counsel's conduct was reasonable and professional). We find nothing in the record showing that trial counsel's actions were so outrageous that no competent attorney would have engaged in them, and we hold that Bazile failed to establish trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 687; *Hart*, 667 S.W.3d at 782, 784. We overrule issue three.

Having overruled each of Bazile's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on March 26, 2024
Opinion Delivered May 1, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.